SORENSON v. UNITED STATES.

(Circuit Court of Appeals, Eighth Circuit. February 13, 1909.)

No. 2,574.

1. POST OFFICE (§ 51*)—BREAKING AND ENTERING POST OFFICE—SENTENCE.

A sentence under Rev. St. § 5475 (U. S. Comp. St. 1901, p. 3694), for stealing post office property, or under section 5478 (U. S. Comp. St. 1901, p. 3696), for breaking and entering a post office, is fatally defective unless it imposes imprisonment "at hard labor" as required by each section.

[Ed. Note.—For other cases, see Post Office, Dec. Dig. § 51.*]

2. POST OFFICE (§ 46*)—BREAKING AND ENTERING BUILDING USED IN PART AS POST OFFICE—ELEMENTS OF OFFENSE.

Under Rev. St. § 5478 (U. S. Comp. St. 1901, p. 3696), making it a criminal offense to "forcibly break into, or attempt to break into, any post office or any building used in whole or in part as a post office, with intent to commit therein larceny or other depredation," an intent to commit larceny or other depredation in the part of the building used as a post office is an essential ingredient of the offense; and where a post office was kept within a room used for mercantile purposes, being separated from the remainder of the room by a fence or partition, a breaking and entering of such room and the stealing of property from a safe therein, although including post office funds, will not warrant a conviction under said section unless it is shown that the safe was within the inclosure used as the post office.

[Ed. Note.—For other cases, see Post Office, Dec. Dig. § 46.*]

3. BURGLARY (§ 41*)—PROSECUTION—SUFFICIENCY OF EVIDENCE—PROOF OF CORPUS DELICTO.

To warrant a conviction for burglary, the evidence must be sufficient to prove affirmatively and beyond a reasonable doubt that there was such a breaking and entry as are necessary to constitute burglary, and evidence which leaves it wholly to conjecture as to the manner in which an entry was effected into a building in which a larceny was committed is insufficient.

[Ed. Note.—For other cases, see Burglary, Cent. Dig. § 97; Dec. Dig. § 41.*]

4. CRIMINAL LAW (§ 417*)—EVIDENCE—DECLARATIONS.

On the trial of a criminal case, where conspiracy is not charged, testimony is not competent against the defendant to show a statement made by some one of a party which included defendant, where the witness admits that he does not know which one made the statement or whether it was heard by or assented to by defendant.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 950; Dec. Dig. § 417.*]

5. CRIMINAL LAW (§ 404*)—DEMONSTRATIVE EVIDENCE—WEAPONS AND TOOLS USED IN COMMISSION OF BURGLARY.

On the trial of a defendant charged with breaking and entering a building used in part as a post office, weapons and implements found on his person when arrested, 18 days after the burglary and 19 miles distant from the place, were not admissible in evidence against him, where it was not shown that such articles were used when the burglary was committed, nor that defendant was in the vicinity at or near the time of its commission.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 891; Dec. Dig. § 404.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

**6.** CRIMINAL LAW (§ 348*)—EVIDENCE—CHARACTER OF ACCUSED.

The mental tendency of a person to commit a crime, as evidenced by weapons or tools in his possession, cannot be shown to convict him of a prior crime.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 796, 798; Dec. Dig. § 348.*]

**7.** CRIMINAL LAW (§ 424*)—EVIDENCE—DECLARATIONS OF CODEFENDANT.

Where defendant and another were arrested for a crime, letters written by such other while they were confined in jail to a third person and obtained from the possession of defendant's wife were not admissible against him, where it was not shown that he ever saw the same or knew their contents or even of their existence until afterward, or that he then knew of or concurred in what was written therein, the possession or knowledge of his wife not being imputable to him.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 1004; Dec. Dig. § 424.*

Admission on joint trial of evidence competent only against one or part of defendants, see note to Sprinkle v. United States, 73 C. C. A. 295.]

**8.** BURGLARY (§ 42*)—EVIDENCE—POSSESSION BY DEFENDANT OF PROPERTY STOLEN.

On the trial of a defendant charged with burglary and the larceny of property from a safe, including watches owned by a jeweler, evidence tending to show that a watch found in a dresser drawer in the house occupied by defendant's wife three weeks after the burglary, and when defendant was in jail, was one of those stolen, was not admissible against him, it not being shown that he had ever been in possession of the watch; and especially where the evidence to identify the watch as one stolen was inconclusive and disputed by defendant's wife, who claimed ownership of the watch, and to whom it was returned by the officers.

[Ed. Note.—For other cases, see Burglary, Dec. Dig. § 42.*]

**9.** CRIMINAL LAW (§ 338*)—EVIDENCE—RELEVANCY—ADMISSION OF CIRCUMSTANTIAL EVIDENCE.

It is a recognized rule of evidence in the investigation of criminal cases dependent upon circumstantial evidence that a wide range of inquiry may be indulged, and that remotely connected incidents, no one of which singly considered would be sufficient to warrant a conviction, may be admitted, and, if the collective whole be sufficient to carry conviction of guilt to the jury beyond a reasonable doubt, their admission to that end is justified; but such rule does not imply that mere suspicion is the equivalent of proof, or that mere hearsay testimony may be resorted to, or that unrelated incompetent incidents and circumstances may become admissible because of the number of them.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 753; Dec. Dig. § 338.*]

**10.** POST OFFICE (§ 49*)—BREAKING INTO POST OFFICE—SUFFICIENCY OF EVIDENCE.

The competent evidence on the trial of a defendant charged with breaking and entering a building used in part as a post office, and for stealing property therein, considered, and *held* insufficient to sustain a conviction.

[Ed. Note.—For other cases, see Post Office, Dec. Dig. § 49.*]

Hook, Circuit Judge, dissenting.

In Error to the District Court of the United States for the Southern District of Iowa.

See, also, 143 Fed. 820, 74 C. C. A. 468.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

E. D. Perry (W. A. Spurrier and E. C. Mills, on the brief), for plaintiff in error.

Marcellus L. Temple, U. S. Atty., and George B. Stewart, Asst. U. S. Atty.

Before SANBORN and HOOK, Circuit Judges, and PHILIPS, District Judge.

PHILIPS, District Judge. The plaintiff in error (hereinafter desig-- nated the defendant) was indicted in connection with one Frank Hodge, in two counts, predicated of section 5478, Rev. St. U. S. (U. S. Comp. St. 1901, p. 3696), for forcibly breaking into a building used in part as a post office of the United States, in the town of Van Meter, Dallas county, Iowa. There was another count in the indictment, predicated of section 5475 of the statute (U. S. Comp. St. 1901, p. 3694), for stealing property in said post office belonging to the Post Office Department, to wit, postal funds of the value of $66.62 and money order funds of the value of $76.86. On trial to a jury a verdict of guilty was returned "as charged in the indictment." Thereupon the court sentenced this defendant on the first count to imprisonment in the Iowa State Penitentiary, at Ft. Madison, for a period of four years; and on the second, for the larceny, the sentence was imprisonment for a period of two years and six months, the time of the sentence under the last-named count to commence at the termination of the sentence under the former; with the further order that the defendant be fined in the sum of $5 and pay one-half of the costs of the prosecution. There was no sentence on the other count, for breaking into the post office, presumably for the reason that the two counts predicated of the burglary were for one and the same offense. The defendant Hodge was sentenced to imprisonment in said penitentiary for four years under the count for burglary, and one year and six months in said penitentiary on the count for larceny, with the imposition of a fine of $5 and the payment of one-half the costs.

The penalty prescribed for a violation of said section 5478 is a fine of not more than $1,000 and imprisonment at hard labor for not more than five years. The penalty for the violation of section 5475, when the value of the property is $25 or more, is imprisonment at hard labor for not more than three years. It is observable that the imprisonment prescribed in both of said sections of the statute is at hard labor. There is no fine imposable under section 5475 where the value of the property exceeds $25. Under section 5478 both imprisonment and fine are mandatory. The judgment does not show that the $5 fine imposed was under the count for burglary. Both judgments are fatally defective for failing to impose the imprisonment at hard labor. The rule in the courts of the United States is that "a judgment in a criminal case must conform strictly to the statute, and any variation from its provisions, either in the character or extent of the judgment invoked, renders the judgment absolutely void." Harman v. United States (C. C.) 50 Fed. 921; Ex parte Karstendick, 93 U. S. 396, 23 L. Ed. 889; In re Graham, 138 U. S. 461, 11 Sup. Ct. 363, 34 L. Ed. 1051; Ex parte Lange, 18 Wall. 163, 21 L. Ed. 872; In

re Mills, 135 U. S. 263, 10 Sup. Ct. 762, 34 L. Ed. 107. This defect would of itself compel a reversal of the judgment and remand for further proceedings in conformity to law. The course to be pursued on the remand of a case in such contingency is pointed out in United States v. Harman (D. C.) 68 Fed. 472, Woodruff v. United States (C. C.) 58 Fed. 766, and in Re Bonner, 151 U. S. 242, 14 Sup. Ct. 323, 38 L. Ed. 149.

The codefendant Hodge did not join in the writ of error, which is prosecuted alone by the defendant Sorenson.

The first count of the indictment is predicated of section 5478, Rev. St. U. S., which declares that:

"Any person who shall forcibly break into, or attempt to break into any post-office, or any building used in whole or in part as a post-office, with intent to commit therein larceny or other depredation, shall be punished," etc.

It has been, without dissent, the view of the District Courts administering this statute, since the considerate and logical opinion of Judge Deady, in United States v. Campbell (C. C.) 16 Fed. 233, that it should be interpreted as if it read "with intent to commit larceny in the part of said building used as a post-office." See United States v. Williams (D. C.) 57 Fed. 201; United States v. Yennie (D. C.) 74 Fed. 221; United States v. Saunders (D. C.) 77 Fed. 170; United ed States v. Shelton (C. C.) 100 Fed. 831. In the Shelton Case, Judge Simonton, in discussing the instance of a breaking into a building, a single room, used for the sale of merchandise and in part as a post office, where only goods of the merchantman were taken, said:

"If we construe this section to mean that any entry, with felonious intent, into any part of a building used in part as a post office, is punishable in the federal court, then it would give the court jurisdiction of a common-law offense. This jurisdiction federal courts cannot exercise. But if we construe the section to punish an entry into that part of the building used as a post office, with intent to commit larceny therein, the jurisdiction can be sustained. The section is ambiguous. Under these circumstances, it must be construed 'ut magis valeat quam pereat.' 'If,' says Mr. Justice Story in U. S. v. Coombs, 12 Pet. 76, 9 L. Ed. 1006, 'the section admits of two interpretations—one which brings it within, and the other passes it beyond, the constitutional authority of Congress—it will become our duty to adopt the former construction, because a presumption ought never to be indulged that Congress meant to exercise or usurp any unconstitutional authority, unless that conclusion is forced upon the court by language altogether unambiguous.' In U. S. v. Campbell (C. C.) 16 Fed. 233, Judge Deady sustained the demurrer to an indictment charging a defendant under this section, because the indictment did not state that the larceny was intended for that part of the building used as a post office. In U. S. v. Williams (D. C.) 57 Fed. 201, an indictment under this section was sustained. The word 'therein' in the indictment, used also in the section, was held to refer to the post office. It was thus distinguished from the case of U. S. v. Campbell. The indictment in this latter case used the words 'in said building,' and so would mean in any part of the building, whether used as a post office or not. So it was held bad on demurrer. This construction of the section seems, also, to have met the approval of Judge Brown, of New York, in U. S. v. Yennie (D. C.) 74 Fed. 221. It is distinctly decided in U. S. v. Saunders (D. C.) 77 Fed. 170. The evidence being uncontradicted that the breaking into, the entry, and the larceny were neither of them in that part of the building used as a post office, the defendant cannot be convicted under this section."

The United States district attorney in drawing the indictment here in question recognized such construction of the statute. The charge is that the defendants did—

"unlawfully, willfully, and forcibly break into a certain building then and there used in part as a post office of the United States, to wit, a building in Van Meter, in the county of Dallas, in the state of Iowa, so used as aforesaid, with the intent of them, said Andrew H. Sorenson and Frank Hodge, then and there to commit larceny therein in that part of the said building then and there so used as a post office of the United States."

The intent in breaking into the building is the essence of the offense denounced by this section, and it must be proved as alleged. We are not here concerned with the question as to the competency of Congress, within constitutional limitations, to declare it a felony for a person to break into a building used in whole or in part as a post office. It is sufficient for the purpose of this case to say that Congress has not assumed the exercise of such power. It limited the offense of breaking into a building to the intent to commit in and on the Post Office Department a larceny or other depredation. This intent is a jurisdictional fact, because it is constitutive of the offense, and conditions the exercise of jurisdiction over it by a federal court. The statute in question was enacted by Congress in recognition of the fact that in a vast number of instances, especially in small towns and rural districts, post offices are kept in the same building and on the same floor where mercantile or other business is conducted by the occupants of part of the room. But it is the recognized practice in such instances that the post office apartment shall be fenced off or separated from the other part of the building or room. So under Postal Laws and Regulations, § 318, subsec. 3, it is observable that, in the matter of rent of a part of a building by a postmaster for post office purposes, a report is required to be made to the Postmaster General, giving a description of the room or store and the class of business carried on by the occupant, and what separation there will be between the post office and the other parts of the room. This is required before the postmaster is permitted to so locate his post office. And he is presumed to keep within his own apartment the property pertaining to the post office. For his own protection he may deposit the funds of the post office in some depository for safe-keeping. But if such deposit should be made elsewhere, the breaking into such place would not be indictable under section 5478.

Under the evidence in this case the only possible inference as to the manner of the entry into the building is that it must have been through either the front or the rear door thereof, both of which entered into the part of the building used for mercantile purposes. The post office apartment was fenced off in what was designated by the witnesses as a "cabinet." The property taken was contained in a safe not shown to be within the post office inclosure. Part of the property was jewelry belonging to the merchantman, and part of it was funds belonging to the post office. As there was nothing to indicate to the thief that the money was the property of the United States unless the safe was in that part of the inclosure marking the post office apartment, there would be nothing except the merest con-

jecture from which the jury could infer the required intent in the breaking to steal post office funds. If having entered he found in the safe, no matter where situated, post office funds, the property of the United States, and stole them, he was guilty of larceny, punishable under another statute, on which the second count of the indictment was based.

The charge given to the jury authorized a conviction of the defendants on the first count of the indictment if the money of the Post Office Department was taken from the safe anywhere in the building. The only evidence respecting this material issue is the testimony of the witness Trindle, who was the assistant postmaster, and who also conducted the business of a jeweler in the building in question. He testified that there was a post office safe in the building, in which the post office funds were kept, and in which he also kept watches and other jewelry of his shop. The post office compartment seems to have been inclosed, as above stated, in what is termed a "cabinet." A careful reading of his testimony, which presents all that was developed respecting this matter, makes it impossible to determine with any degree of accuracy or satisfaction that the safe was within the inclosure of the post office compartment. As this was a material jurisdictional fact, it should have been made affirmatively to appear. The omission of proof entitled the defendant to the request for a directed verdict as to the counts predicated of the forcible breaking into the building.

There were other errors committed on the trial which necessitate the reversal of the judgments on both counts. The offense denounced by said section 5478 is the forcible breaking into a building used in part as a post office, as in this case. The testimony of said Trindle was that at the usual closing hour of the store, the evening before the alleged burglary and larceny, he put certain jewelry, including a certain watch, in the safe, and locked it, and that "all the doors and windows were locked." There is a total absence of any direct evidence as to how the store was entered. There was no appearance of any physical force used in effecting an entry, if the building was entered from the outside. The testimony of said witness is that he went to the post office about 4 o'clock the next morning; that a young man came to his house and said there had been a robbery uptown, and that the post office safe had been blown open; that when he got there Mr. Phillips, the postmaster, was there; "they told me to come around to the back door, and I went in; the room was full of gas and smoke, and the safe door was out on the floor; the lining of the safe was all torn out and scattered around; there were stamps lying there unmolested; but the post office funds and watches were gone." There was nothing said about the front door, or whether the back door was open when the first parties reached the building. So that the proof of the forcible breaking into the building rests solely upon the fact that the doors and windows were locked the evening before the larceny. It is suggested in argument that it is not essential to the proof of a forcible breaking that the evidence should show the application of physical, violent force, such as breaking through a window or breaking open a door, but that the offense would be committed by an

entry through the door, by unlocking it with a skeleton or false key, and the like; and as that is the only reasonable explanation of how the entry could have been effected, after the doors and windows were locked, the proof was sufficient to warrant the jury in concluding that the entry was so effected. "Mere conjectures, or suspicions, are not reasonable inferences or presumptions upon which to found convictions of crime." Green v. State, 68 Ala. 511. If conjectures are to be indulged, there is nothing in this record to disprove that the thief may not have been concealed in the storeroom when it was closed the preceding evening. It does not appear that any search of the building was made for such discovery when the closing took place. Entering without breaking and then breaking out does not constitute burglary. 1 Hale, P. C. (Phila. 1847) 554; State v. McPherson, 70 N. C. 239, 16 Am. Rep. 769; Adkinson v. State, 64 Tenn. 569, 30 Am. Rep. 69; White v. State, 51 Ga. 285; State v. Wilson, 1 N. J. Law, 439, 1 Am. Dec. 216. "To prove the corpus delicti, the evidence must be sufficient to show affirmatively, and beyond a reasonable doubt, that there was such a breaking and entry as are necessary to constitute burglary." 6 Cyc. (1903) 241, and citations.

If it be conceded that this evidence was sufficient to warrant a finding that the entry was effected by unlocking the door of the building, the important question remains: Was there sufficient evidence to go to the jury that the defendant so entered the building? If he had been seen about the building recently prior to the theft, and had been found inside thereof after it had been closed and locked, the jury could be indulged to infer that he had entered from without rather than that he was in when the building was so closed. There was a total absence of evidence that he was either so about the building or in the vicinity thereof, either before or after the theft. In this extremity of the government's case resort was had to the testimony of the witness Ernest Willey, who had been a penitentiary convict. The evidence, without contradiction, was that his general reputation for truth and honesty was bad. He attributed his conviction and sentence to the penitentiary for larceny to the defendant Sorenson, and admitted on the witness stand that he "had ill will against Andy Sorenson ever since I had to go to Ft. Madison"; and that he was "waiting for a chance to do Andy some damage ever since I went to the Ft. Madison penitentiary." He admitted that after this alleged burglary and larceny he was in the service of the officers in pursuing the defendant, and had received money from them for his services. It is not impertinent to observe that the employment of such a derelict by law officers, as an agent of justice, is not commendable, because of the danger ever to be apprehended that from malice, revenge, and the hope of reward such a man is likely to give false testimony against an innocent man. While his testimony is not outlawed, its probative force being for the jury, the wisdom of the law manifests itself in prescribing limits to the admissibility of the purported facts collected by such a self-serving witness. Campbell, J., in People v. Montague, 71 Mich. 447, 451, 39 N. W. 585, 587, commenting upon the unreliability of the questionable testimony of certain witnesses, said:

"Leaving out their testimony, the case would be without any plausible foundation. It all depended on whether that testimony was true. This being so, it is important both for the. people, interested in doing justice, and for the respondent, entitled to be protected against injustice, to have the trial kept clear from extraneous matter, and the rules of law governing procedure substantially guarded."

This witness (Willey) was indulged to testify that about a week or ten days before the depredation upon the post office he was with the defendant and Hodge, and a man named Gleason, at Valley Junction, Iowa, and drove the team on a fishing excursion; that in a conversation there was talk to the effect that they wanted to know if "he did not want to drive a team, Andy's team, and go to Van Meter and get a 'P. O.' "; that this was said by one of them, he did not remember exactly which one; he could not say whether it was in the presence of all of them or not, but he thought it was; that they were about 15 feet away from him; "which one made the proposition, I cannot say for sure."

Was this evidence competent to bind the defendant? As it failed to show that the defendant did the talking, for the witness said he did not know which one it was, it devolved upon the government to show to the satisfaction of the jury two additional facts: (1) That the defendant heard it; and (2) that he assented to it.

"In the case of sayings by other persons, it ought to be made affirmatively to appear that he heard the sayings, and that he assented to them either expressly, or by his way showing assent. His assent to them is the thing which makes them admissible against him, and that assent must be shown in some way, before the sayings can be admitted." Drumright v. State, 29 Ga. 430, 431.

So Taylor, C. J., in Weightnovel v. State, 46 Fla. 1, 15, 35 South. 856, 861, said:

"If the conversation was not had in the presence or hearing of the defendant, it was hearsay, and to render it admissible as having been made in defendant's hearing the burden was upon the state to show clearly that it occurred in the hearing of defendant and this fact was a preliminary one for the court, and not for the jury to decide, before admitting the conversation in evidence, and we do not think it was clearly and satisfactorily shown to have occurred in his hearing."

The mere fact that such a statement was made by some one in the party, if in the hearing of the defendant, not then assented to by him, was not admissible upon the ground that silence gave consent. "Mere silence is no ground of inference against him," unless he was called upon by the circumstances to dissent. Vail v. Strong, 10 Vt. 457; Gale v. Lincoln, 11 Vt. 152; Fourth National Bank v. Nichols, 43 Mo. App. 391; Commonwealth v. Kenney, 12 Metc. (Mass.) 235, 46 Am. Dec. 672; Commonwealth v. Brown, 121 Mass. 69; Commonwealth v. Densmore, 12 Allen (Mass.) 535; Larry v. Sherburne, 2 Allen (Mass.) 34. The following authorities are also against the admissibility of this evidence: Sauls v. State, 30 Tex. App. 496–498, 17 S. W. 1066; Yale v. Dart (City Ct. N. Y.) 17 N. Y. Supp. 179; Drumright v. State, 29 Ga. 430.

In the absence of a charge and proof of conspiracy between the three parties at the time and place of the conversation, to admit

such statement without affirmatively showing it to have been made or acquiesced in by the defendant would be to announce a rule fraught with danger to innocent men. Commonwealth v. Kenney, 12 Metc. (Mass.) 235, 46 Am. Dec. 672; Moore v. Smith, 14 Serg. & R. (Pa.) 393.

It is true that Willey claims that he was friendly with Sorenson up to the time of the trial of this case; but that the relation must have been strained is evident from the fact that he claims Sorenson was principally instrumental in sending him to the penitentiary, and his statement that he had it in mind ever since to "get even" with him for the injury. He testified that his principal occupation was that of fishing, which might account for his accompanying this party on a fishing excursion. Conceding, however, that the credibility of his story was for the jury, the wisdom of the law is again demonstrated in demanding that it should be made to affirmatively appear that the defendant heard and assented to the proposition, and that every reasonable intendment should be indulged in favor of the accused.

The government was also indulged, over the objection of the defendant, to show by detective officers that when they arrested the defendant and Hodge, about 18 days after the alleged burglary and at a point about 19 miles distant from said post office, they found on him a revolver, pieces of fuse, and a bottle containing liquid matter which proved to be nitroglycerin, which he afterwards stated he used for headache; and that there was found on the person of Hodge a revolver and pieces of fuse, and some skeleton keys, dynamite caps, and a flashlight, profert of which was made before the jury. As there was nothing to connect the employment of the revolvers and other articles with the burglary, and the possession of them was 18 days after the commission of the offense, we know of no principle of law rendering such facts competent evidence against the defendant on this trial, especially when the evidence disclosed that the defendant worked in coal mines, and such fuse, dynamite caps, and such lights were usable in such work. Looking to the charge of the court, it would seem that it was regarded competent as tending to show the defendant might be contemplating the commission of a crime. The court said:

"The evidence which has been allowed to come before you should have such weight as in your opinion it is entitled to under the showing that they were going to commit some other crime."

The particular language above adverted to was not excepted to, but the admission in evidence and the display of the articles and instruments to the jury were excepted to and assigned for error. We may properly look to the charge of the court for his reasons, if there given, for the admission of the questioned evidence. In the multiplication of reported cases touching the evidential effect of the possession by the accused of implements and materials adaptable to the commission of the crime in question, it will be found that some courts have admitted such facts for the consideration of the jury when such possession was more or less remote from the time and locus of the

crime; but their admissibility depended upon their being connected up with or traced to the res gestæ. If the articles found on the defendant had been traced to his possession prior to the burglary or theft, and there had been any evidence tending to show the presence of the defendant about the premises near to the time of the trespass, and the like, the jury might have been advised that such possession of articles and implements, if the evidence tended to show that they were probably used in executing the crime, was a circumstance for their consideration. But the mere possession 18 days after the crime and 19 miles distant from the locus, without any proof of the presence of the defendant in the locality, or the employment of such articles in the commission of the crime, was not evidence of the defendant's complicity, nor was it evidence "that they were going to commit some other crime." The ability to commit a crime does not evidence the act. The mental tendency of a party to commit a crime cannot be heard in court to convict him of another offense committed long anterior to the transaction under inquiry. If he declined to put in issue his character, the prosecution cannot attack it in such fashion. Even evidence of the commission of another offense, at such remote date, even if allied in character to the one under investigation, is inadmissible. Rex v. Birdseye, 4 Carr. Payne, 386; State v. Renton, 15 N. H. 169; Commonwealth v. Wilson, 56 Mass. 590; State v. Meyers, 82 Mo. 558, 52 Am. Rep. 389. This rule, it is true, admits of exceptional instances, as where the subsequent act is so related to its antecedent in character and locality as to aid in identifying the actor in both by the connection tending to show "that he who committed the one must have done the other." Shaffner v. Commonwealth, 72 Pa. 60, 65, 13 Am. Rep. 649; State v. La Page, 57 N. H. 245, 289, 24 Am. Rep. 69; Farris v. People, 129 Ill. 521, 21 N. E. 821, 4 L. R. A. 582, 16 Am. St. Rep. 283; State v. Raymond, 53 N. J. Law, 260, 21 Atl. 328; State v. Vance, 119 Iowa, 685, 94 N. W. 204; People v. Sharp, 107 N. Y. 427, 14 N. E. 319, 1 Am. St. Rep. 851; People v. Molineaux, 168 N. Y. 293, 61 N. E. 286, 62 L. R. A. 193. Mr. Justice Harlan, in Boyd v. United States, 142 U. S. 450, 458, 12 Sup. Ct. 292, 295, 35 L. Ed. 1077, speaking to the admission in evidence of robberies committed by defendants, separate and apart from the homicide under investigation, said:

"They were collateral to the issue to be tried. No notice was given by the indictment of the purpose of the government to introduce proof of them. They afforded no legal presumption or inference as to the particular crime charged. * * * Proof of them only tended to prejudice the defendants with the jurors, to draw their minds away from the real issue, and to produce the impression that they were wretches whose lives were of no value to the community, and who were not entitled to the full benefit of the rules prescribed by law for the trial of human beings charged with crime involving the punishment of death."

See, also, the following: State v. Berger, 121 Iowa, 581–586, 96 N. W. 1094; State v. Vance, 119 Iowa, 685, 94 N. W. 204.

The admission in evidence of certain letters is assigned for error. The witness Willey testified that while doing his detective work he got certain letters from the wife of the defendant Sorenson. They

were written while the defendant and Hodge were confined in jail at Des Moines, under arrest for this offense. They were written to one Fairgraves. The purport of the letters was to request Fairgraves to testify to an alibi for the writer. The proof was that they were written by Hodge, and not by the defendant Sorenson. There was no evidence that Hodge wrote the letters under the dictation or with the knowledge and concurrence of this defendant, or that the defendant ever saw them, or sent them out of the jail, or that he had opportunity even to have seen the letters. To implicate the defendant therewith, Willey testified that after he (Sorenson) was out on bail he asked him (Willey) if he had taken the letters to Fairgraves, and he said he had. Did the defendant at the time they were written know that Hodge was writing the letters? Or did he learn the fact after Hodge had written the letters, and did he acquiesce therein? Or did he learn from his wife, after he was out on bail, that such letters had been given to Willey to be delivered? All these are mere matters of conjecture; one inference being just as tolerable and reasonable as the other. Is a man's guilty knowledge and participation to be thus placed in the wide field of mere conjecture and speculation, when the law demands that he must be presumed to be innocent, and that this presumption cannot be displaced except by such affirmative facts as shall satisfy the minds of the jury beyond a reasonable doubt of his guilt; and when it further commands that if the act or conduct of the accused may be accounted for upon a hypothesis that consists with his innocence equally with his guilt, it shall be referred to his innocence?

The exactions of the law in this respect are illustrated by the following rulings on applied principles: In State v. Loftus, 128 Iowa, 529, 104 N. W. 906, the defendant, Mrs. Loftus, was prosecuted for adultery. To show illicit correspondence conducted with the defendant, the state introduced in evidence certain billets, which the evidence tended to show were in the handwriting of one Merrifield, the alleged adulterer. One of the missives was found under her bed where she and her husband usually slept, and another in an unsealed envelope under the bed in a spare room. The evidence did not show how they reached the house, or that they were otherwise in the possession of or ever had been seen by the defendant. This was supplemented by testimony tending to show that the defendant and Merrifield had been seen to exchange notes on the street. Her husband also testified that in discussing divorce proceedings between them he said to her: "I have got some notes which will be pretty hard for you to account for;" to which she replied: "They don't amount to much. There is no name signed." The court said of this:

"To what notes either referred is not disclosed. The record fails to connect those introduced in evidence with the accused, and it was error to admit them."

In Fearing v. Kimball, 4 Allen (Mass.) 125, 126, 81 Am. Dec. 690, it was held that an unanswered letter is inadmissible, although the statements contained are well known to the addressee. "This is on the ground that a letter written to a party by a third person to which

no reply is made does not show acquiescence in the facts stated in the letter."

So in Commonwealth v. Edgerly, 10 Allen (Mass.) 184, it was held that, under a charge of counterfeiting, a letter containing counterfeit money, found in the defendant's possession when arrested, is inadmissible in evidence.

In People v. Green, 1 Parker, Cr. R. 11, it was held the possession by a person of an unanswered letter found in his pocket at the time of his arrest was not of itself evidence of the truth of the contents, and it cannot be read in evidence against him.

People v. Colburn, 105 Cal. 648, 38 Pac. 1105, was a prosecution for robbery, alleged to have been committed by the defendant and Knox, and one Masterson, who pleaded guilty. After the arrest of Masterson the defendant and Knox disappeared. Some months later the defendant was arrested in Arizona, and a letter was found upon his person written by one Moore, in which Moore stated that he had been trying to ascertain the whereabouts of the defendant for some time and warn him of the fact that he was suspected of the robbery; that effort was being made by the officers to locate and arrest him. It contained statements of the writer assuming that the defendant was guilty of the robbery. The court said that such statements in the letter were well calculated to impress the jury with a belief of the defendant's guilt, and it was clearly hearsay:

"It will not do to say that Moore was a friend of the defendant, and hence that the evidence was admissible. * * * The question of friendship or enmity does not properly constitute a factor in the problem. The letter was a statement of a third party in nowise connected with the defendant, was not made under the sanction of an oath, and not admissible."

After, stating that a letter found upon the prisoner when arrested has been held to be no evidence of the facts stated in it, the court further said:

"There are exceptions to the rule, as, for instance, where it is shown that the defendant has acted upon the information contained in the letter, or where he has answered it, in which case so much of the letter as is explanatory of his answer is admissible, or where the party receiving the letter has by his acts or conduct invited the sending of it to him. There was no sufficient showing to render the letter admissible under any of these exceptions."

The case of State v. Shive, 58 Kan. 783, 51 Pac. 274, presents a most considerate opinion by Chief Justice Doster in the application of the principle of law in question. The defendant was charged with the crime of robbery. In order to connect him and another party with the scene of the robbery, pieces of an envelope, found near a haystack about three miles south of the house where the robbery occurred, were introduced in evidence. The envelope when pieced together indicated that it was addressed to the defendant Shive, on the street in which he lived, with a card directing its return to the street on which the other defendant lived. It also bore the stamp and postmark of a given town. There was also evidence tending to show that the defendant was seen on the afternoon of the robbery at the haystack. There was no direct evidence that the envelope had been in the possession of the defendant. Of the objection to the admis-

sibility of these scraps of paper the trial court said, "They are only competent as a circumstance," as tending to show that the defendant was in the vicinity of the place where the crime was committed, a short time before its commission. But Judge Doster said:

"No connection between the defendant and the paper being shown, he was unable to explain it. The state never having shown that he had it or was responsible for it, he was not called upon to explain how he parted with it, or how it came to be in the place where found. The presumption that, according to the known course of the postal service, an addressed and stamped letter reaches its destination, will not, in our judgment, suffice to show that the envelope enclosing such letter, found thereafter many miles from the place of residence of the addressee, was left by him at the place where found. * * * We are not permitted, at least against a person accused of crime, to tack one presumption upon another and from the series infer guilt against him. The very contrary is the rule."

In Long v. State, 81 Miss. 448, 33 South. 224, the defendant was indicted for robbery, committed by entering the house of one Lawson, at night, and taking some money therefrom. For the purpose of incriminating the defendant, the daughter of Lawson was permitted to testify that on the evening before the occurrence she told the defendant's wife that her father had received his pay that day for some work. It was held that this evidence was inadmissible, without proof that the defendant had knowledge of the possession of the money by Lawson, the court saying, "The wife's knowledge is not the husband's knowledge."

So here, the popular conception of the relation between husband and wife, as the depositaries of mutual confidences, possibly might lead the jury to conclude that the wife's possession of the letters was that of the husband as his agent. But in criminal law it is axiomatic that the wife's knowledge is not the husband's knowledge, and her possession of the article not belonging to the husband is not imputable to him. Therefore, it did not devolve upon the defendant to show or explain how the letters got into his wife's possession; but it devolved upon the government to show that he gave or sent them to her for delivery, with knowledge of their contents. This principle is recognized in Nevada Company v. Farnsworth, 102 Fed. 573–576, 42 C. C. A. 504, where it was sought to employ against the defendant a letter written between third parties containing statements said by the writer to have been made to him by the defendant. In that case Judge Thayer said, "It was not shown that the defendant either authorized the letter in question to be written, or that he saw the same, and was acquainted with its contents, before it was mailed;" and, therefore, it was held incompetent. Proof of such authorization "must be established by evidence that does more than raise a mere suspicion, a conjecture, or possibility, for evidence which merely shows it possible for the fact in issue to be as alleged, or which raises a mere conjecture that it is so, is an insufficient foundation for a verdict, and should not be left to the jury." State v. Massey, 86 N. C. 658, 41 Am. Rep. 478; Coffin v. United States, 156 U. S. 432, 15 Sup. Ct. 394, 39 L. Ed. 481; Sprinkle v. United States, 150 Fed., loc. cit. 62, 82 C. C. A. 1.

For the purpose, we presume, of connecting the defendant with both the alleged burglary and the larceny, the government introduced evidence tending to identify a watch, found in a dresser drawer of a folding bed in the house occupied by Mrs. Sorenson, as among those claimed to have been put in the safe by the jeweler, Trindle, the evening before the larceny. This was after the defendant's arrest, and when he was in jail, nearly three weeks subsequent to the theft. The officers who made the search of the house and took the watch returned it to Mrs. Sorenson the next morning. While she testified to the ownership of the watch, and there was some corroborative testimony to support her claim, the evidence on the part of the government tended to the contrary. Was this evidence admissible and sufficient to authorize the jury to infer the defendant's connection with either the burglary or the larceny?· Conceding that the time within which the watch was found brought the incident within the rule of "recent possession of stolen property," it must be kept in mind that the defendant is not charged with the offense of ' receiving stolen goods, etc., and under the indictment is only called upon to meet the charge of burglary and larceny committed by him.

"To raise the presumption of guilt from the possession of the fruits of the instruments of crime by the prisoner, it is necessary that they should be · found in his exclusive possession. A constructive possession, like constructive notice or knowledge, though sufficient to create a civil liability, is not sufficient to hold the party responsible to a criminal charge. He can only be required to account for the possession of things which he actually and knowingly possessed; as, for example, where they are found upon his person, or in his private apartment, or in a place of which he kept the key. If they are found upon premises owned or occupied as well by others as himself, or in a place to which others have equal facility and right of access, there seems no good reason why he, rather than they, should be charged upon this evidence alone." 3 Greenleaf's Evidence (16th Ed.) § 33.

The rule is stated as follows by Underhill, Crim. Ev. § 300:

"Not only must the possession be recent, but it must be personal, exclusive, and with a distinct, implied, or expressed assertion of ownership. If these essentials are not proved, a conviction based upon the fact of possession must be set aside. A mere constructive possession is not enough. The accused will not be presumed to have stolen articles which he does not know he possesses. If other persons have equal right and facility of access with him to a room, trunk, or closet where stolen goods are discovered, possession not being exclusive or personal, is of no value as evidence."

"To warrant an inference of guilt of theft from the circumstance of possession of recently stolen property, such possession must be personal and exclusive, must be unexplained, and must involve a distinct and conscious assertion of property by the defendant." Field v. State, 24 Tex. App. 422, 6 S. W. 200; State v. Castor, 93 Mo. 251, 5 S. W. 906.

The watch was not found on the person or in the actual possession of the defendant. The testimony of the witness Sims, for the prosecution was that "Hedrix found a watch there—taken out of a drawer on top of folding bed"; and Hedrix' statement was:

"It was found either on top of the folding bed or the dresser, in a little drawer on the top. It might have been both—folding beds are both."

Mrs. Sorenson testified: ,

"I remember them getting the watch out of a drawer in the folding bed. Hedrix took the watch away. It was my watch."

In recognition of the fact that it was taken from her possession, the officers returned it to her. There is no evidence that after the alleged larceny the defendant was in the house or room where this watch was found. The only evidence touching this is the statement of the eager witness Willey, who first testified that he saw the defendant's team in front of Hanson's saloon a little after 4 o'clock of the day the robbery occurred at Van Meter, that he next saw the team at the defendant's house the next morning in the back yard, and that the defendant was wiping down one of the horses. Giving full credit to the testimony of this witness, it only shows that there was a possibility that the defendant might have entered the room of his wife after the robbery and given her the watch. His conviction ought not to rest upon such conjecture, when there is no evidence that he was even in Van Meter the night when the larceny was committed, or without any evidence that he was absent from his home that night.

The civil unity of the marital relation has in no case been extended in a criminal proceeding to make stolen goods, found in the wife's possession and claimed by her as her individual property, the possession of the husband, especially so in the absence of the husband. In such case "he could not reasonably be required to account for or explain the possession of another." State v. Warford, 106 Mo. 63, 16 S. W. 888, 27 Am. St. Rep. 322.

In State v. Owsley, 111 Mo. 450–451, 20 S. W. 194, it was held that the fact that part of the stolen property was found in the house of defendant's wife, with whom he was not at the time living, is not sufficient to raise the presumption that he stole it, for the reason that "the possession of the wife could not under those circumstances be regarded as the exclusive possession of the husband." See, also, People v. Hurley, 60 Cal. 74, 44 Am. Rep. 55; Turbeville v. State, 42 Ind. 490; State v. Griffin, 71 Iowa, 372, 32 N. W. 447; Perkins v. State, 32 Tex. 109.

The possession of the watch by Mrs Sorenson and her assertion of ownership thereof, in the absence of the defendant while he was in jail, would tend to incriminate her rather than the husband.

No question is made of the recognized rule of evidence in the investigation of the existence of an alleged fraud or the commission of a criminal offense, dependent upon circumstantial evidence, that a wide range of inquiry may be indulged; and that remotely connected incidents, no one of which singly considered would be sufficient predicate for a conviction, may be admitted; and if the collective whole be sufficient to carry conviction to the minds of the triers of the facts beyond a reasonable doubt, they may be admitted to such end. A proper analysis of the pronouncements of courts favoring the admissibility of isolated instances of an inculpatory character, and the advisability of not excluding each disjected part merely because of its insufficiency to justify a conviction, will disclose that the parts held to be admissible come within the range of legal competency, according to established rules of evidence as applied to the special facts and circumstances of the particular case. But they do not imply that mere suspicion is the equivalent of proof, or that mere hearsay testimony may be resorted to, or that unrelated, incompetent

incidents and circumstances may become admissible because of the number of them. In law as in mathematics the multiplication of 0 by 2 does not make 1. In other words, a piece of evidence, which in and of itself is incompetent under settled rules of law, cannot be rendered admissible by attempting to link it up with some other fact or circumstance that might be competent. Otherwise, it is made possible to augment 1 by the mathematical absurdity of attempting to add to it. 0.

"The facts alleged as the basis of any legal inference must be clearly proved, and indubitably connected with the factum probandum. * * * No weight, therefore, must be attached to circumstances which, however, they may excite conjecture, do not warrant belief. Occurrences may be mysterious and justify vehement suspicion, and yet the supposed connection between them may be but imaginary, and the coexistence indicative of accidental occurrence merely, and not of mutual correlation. * * * Every circumstance, therefore, which is not clearly shown to be really connected as its correlative with the hypothesis it is supposed to support, must be rejected from the judicial balance; in other words, it must be distinctly established that there exists between the factum probandum and the facts which are adduced in proof of it a real connection, either evident and necessary, or so highly probable as to admit of no other reasonable explanation." Wills, Circumstantial Ev. 172, 174.

It appears from the report in 143 Fed. 820, 74 C. C. A. 468, that this case was heretofore before this court on writ of error. The judgment of conviction was reversed on the ground of the improper admission in evidence of the testimony of a post office inspector respecting an alleged confession of guilt by the defendant. No other question was considered or determined by that decision. Whether or not the evidence here complained of was presented on the former trial, or any error assigned thereon, we are not advised by the record on which this writ of error was sued out—the only record here we can consider. The ruling of this court on the former writ of error only tends to show a former wrongful conviction, which certainly does not help the last one.

The desire for a conviction, and the zeal of the prosecutor to secure one, make it more the duty of the ministers of justice to see that the safeguards of the law are not broken down to compass the conviction.

There was not, in our judgment, sufficient competent evidence in this case to justify the conviction of this defendant, and the court erred in not granting the request for a directed verdict.

It results that the judgment of the District Court must be reversed, and the cause remanded with direction to grant a new trial, and for further proceeding not inconsistent with this opinion.

HOOK, Circuit Judge (dissenting). Sorenson and Hodge were twice convicted of the crimes charged in the indictment. Sorenson alone complains of the second conviction. At the first trial evidence of their confessions of guilt was received. We held that the circumstances attending the confessions rendered them inadmissible under the rule of Bram v. United States, 168 U. S. 532, 18 Sup. Ct. 183, 42 L. Ed. 568, and remanded the case for retrial. It was also urged

in their behalf that error was committed in the admission of other evidence against them, but our reversal was not on that account, and no mention was made thereof in the opinion. 74 C. C. A. 468, 143 Fed. 820. When the case was again tried the trial court very naturally supposed the admission of such other evidence was proper and acted accordingly, but it is now held that its action in each instance was erroneous.

I agree that as the statute requires a sentence at hard labor, and it was not imposed, the case should be sent back for correction in that particular; but the opinion of the court goes further, and not only holds that practically all of the evidence received against Sorenson was inadmissible, but leaves it quite doubtful whether an offense under section 5478, Rev. St., was committed by any one. The last of these is the more serious in its consequences. A construction is adopted that destroys much of the effectiveness of the statute in a class of prevalent offenses which, as its language indicates, it was specially designed to cover. I refer to burglaries of post offices in small towns, villages, and rural settlements where the premises are also used for private business.

Section 5478 reads:

"Any person who shall forcibly break into or attempt to break into any post office or any building used in whole or in part as a post office with intent to commit therein larceny or other depredation, shall be punishable," etc.

This is not a case of a post office in one room of a building containing other rooms devoted to private business, and a burglarious entry and larceny in one of such other rooms. Whether the statute would apply to such a case does not arise and therefore need not be discussed. Here the undisputed evidence showed a single room in a frame building, about 22 feet wide, was used in part as a post office and in part as a jewelry store of the assistant postmaster. The main entrance was through double doors in the middle of the store front. There was also a back door and a window which gave upon the alley "right back of the stamp window." There was a fireproof "post office safe" which stood six or eight feet from the window, and a post office cabinet which formed a wall and presumably separated the officials from the public who came to transact business there. It does not affirmatively appear that the post office safe was within the cabinet, but it does appear that it was in the same room and that it contained postage stamps, $143 of postal and money order funds, and some watches belonging to the private business. The safe was blown open in the night-time and the money and watches stolen. Upon this it is in substance said in the foregoing opinion that the federal court has jurisdiction to punish for burglary only when committed for the purpose of taking property of the United States in the post office compartment; that the intent of breaking into the post office must be to take property belonging to the Post Office Department, and that if the safe containing the money was not within the cabinet there was nothing to indicate to the thief that the money belonged to the United States, and therefore it would be mere con-

168 F.—51

jecture to infer the requisite intent to steal post office funds; that the location of the safe within the cabinet was a jurisdictional fact which should have been made affirmatively to appear, and, as the evidence left it doubtful just where the safe was located, Sorenson's request for a directed verdict should have been granted. It will be observed that the letter of the statute broadly covers the forcible breaking into a room used in part as a post office with intent to commit a larceny or other depredation therein, and that the statute is so narrowly construed as (1) to cover only that part of the room which is physically inclosed for the exclusive use of the post office officials; (2) to mean that the intent of the burglar must be to steal or commit other depredation upon property belonging to the Post Office Department which at the time is actually within the restricted inclosure; and (3) that a fireproof safe, in the same room but outside of the restricted inclosure, used for the safe-keeping of property and funds of the Post Office Department, is not within the protection of the law.

This is so greatly at variance with my conception of the letter of the law and its manifest purpose that I am constrained to express my dissent. It is common knowledge that in very many towns, villages, and rural settlements the post office shares with a private business the occupancy of a single storeroom. It is a prevailing custom dictated by considerations of governmental economy and public convenience. The statute was intended to meet this well-known condition of affairs, and the language employed was well selected to that end. The doors, windows, and floor space of such rooms are necessary to the post office, for without them an interior inclosure devoted exclusively to post office use would be neither accessible nor inhabitable. The openings of the room and the floor outside of the cabinet are for the joint use of both the public and the private business. They are as essential to the one as to the other. True, the post office use of them is not exclusive, but the statute says, "used in whole or in part as a post office," and a joint use or a use in connection with another business is certainly a use in part. The statute does not say and does not contemplate that the partial use must be an exclusive use of a part of a room wholly isolated from the remainder by physical barriers. The patrons of the post office must necessarily pass through the doors and in and about the room to deposit and receive mail and transact other business with the public officials, and in doing so a post office use is as clearly exhibited as though the place were the lobby or corridor of a government building occupied solely as a post office. If a sack of mail is thrown into such a room through the front door or the back door, it is then in the post office. Where the post office safe is, there is a post office use, for surely the safe-keeping of the government's stamps, funds, and records is as much a part of the conduct of such an establishment as the distribution of mail matter. There is no law or regulation which required the keeping of the post office safe at Van Meter within the cabinet or in any particular part of the room.

Reference is made in the foregoing opinion to section 318, par. 3, of the postal laws and regulations, requiring a postmaster in his application

for allowance for rent of a part of a room or store to give a description thereof and state what separation there will be between the post office and the other part of the room. The regulation referred to has no application to the post office at Van Meter. It relates exclusively to post offices of the first, second, and third classes, commonly known as "presidential offices," for which rent allowances are made, and its purpose is to aid the department in determining the reasonableness of the allowance sought. But Van Meter was a fourth-class post office for which no rent allowance is made to the postmaster. Common observation tells us that in such post offices it is not at all unusual to keep the case of pigeonholes for the mail on the merchant's shelf back of the counter with the merchandise. It may be flanked by dry goods or groceries, provided, of course, the postmaster keeps his private business separate and distinct, and does not intermingle his own funds and records with those of the post office. It would, I think, be quite difficult to apply section 5478, Rev. St., as construed by my associates to the various phases of burglaries that are being constantly committed in such premises.

It is said the location of the safe within the post office cabinet in the room is a jurisdictional fact. The power of Congress over a subject of legislation committed to it is as plenary and absolute as it would be in a single government having in its organic law the limitations of the Constitution, and it includes all appropriate means for its full exercise. It is not ousted by the concurring presence of that which, if standing alone and apart from its connections, would be of purely local concern. Familiar illustrations of this principle may be found in cases involving legislation under the commerce clause of the Constitution, particularly those arising under the safety appliance acts. National and local affairs have so many points of contact and are frequently so closely interwoven that legislation by Congress properly confined to its constitutional sphere by letter and intent nevertheless affects matters which, solely regarded, are within the jurisdiction of the state; but when this occurs the law of Congress stands unimpaired. I have no doubt of the power of Congress to prohibit and punish burglarious entrances into premises occupied for post office purposes, though they may also be used for a private business; nor have I any doubt, when reading the statute, that Congress intended to exercise the power. It seems to me to be a construction altogether too narrow to say in a case like this that whether the crime charged was committed depends upon the post office safe being in some particular part of the room. It is also said that the intent of the entry must be to steal property belonging to the Post Office Department. But the statute says generally, "larceny or other depredation," without reference to the ownership of the property stolen, destroyed, or injured, and Congress rightly considered that a breaking into such premises in itself directly threatened consequences injurious to the operations of the government, whatever the burglar might steal or injure after he got inside, whether the property of the government or the property of a private individual. The statute contains no provision limiting the ulterior intent of a burglarious entry to particular property, and for a court to insert one to save its jurisdiction, if that

could be done, implies a denial of the power of Congress to protect premises used in part as a post office, regardless of the unlawful design upon its contents. Such a doctrine applied generally to the operations of the national government would disturb many views of the powers of Congress under the Constitution hitherto supposed to have been settled. Finally, it is said, in substance, that the particular intent of the burglarious entry depended upon what the burglar found and concluded to steal after he got inside, and that it would be mere conjecture that his intent was to steal post office funds if the safe containing them was not in the part of the room exclusively used for post office purposes. I think that to refute this proposition it need only be stated.

At the second trial the government was compelled to rely wholly upon circumstantial evidence, and a body of facts and circumstances was shown which convinced the jury of the guilt of the accused. The admission of these facts and circumstances is now severally assailed as well as their probative value. The contentions of counsel in these respects show a misconception of the fundamental principles of circumstantial evidence and a confusion of the duty of the trial court with the province of the jury. The admissibility of a fact in evidence is denied because of insufficiency in itself to convict, instead of being tested by its circumstantial relevancy to the question of guilt. Inferences from proven facts are dismissed as conjectures, testimony is claimed to have been improperly admitted under rules of evidence which are not applicable, and testimony relevant for one purpose claimed to be inadmissible because not relevant for another.

In determining whether a circumstance tends to show the probability of guilt or other ultimate fact in issue, the process of reasoning should be that of everyday life, not that of the schooled logician or scientist. If, when tested by common, human experience, a probable connection may be inferred between a fact proved and the fact in issue, it is sufficient. A circumstance may by itself appear quite remote from the ultimate issue, yet it should not be excluded on that ground, for its relation to other circumstances may impart to it an added significance, and the coincidence of a number may result in satisfactory proof. From their very nature they operate jointly and in a body, and to challenge them singly and severally is to ignore the very philosophy of the law of circumstantial evidence. The Supreme Court has always taken a broad and liberal view upon this subject, and has rarely reversed a case because of the admission of circumstantial evidence.

"Whenever the necessity arises for a resort to circumstantial evidence, either from the nature of the inquiry or the failure of direct proof, objections to testimony on the ground of irrelevancy are not favored, for the reason that the force and effect of circumstantial facts usually and almost necessarily depend upon their connection with each other." Castle v. Bullard, 23 How. 172, 187, 16 L. Ed. 424.

"Circumstances altogether inconclusive, if separately considered, may, by their number and joint operation, especially when corroborated by moral coincidences, be sufficient to constitute conclusive proof." The Slavers, 2 Wall. 383, 401, 17 L. Ed. 911.

"It is well settled that, if the evidence offered conduces in any reasonable degree to establish the probability or improbability of the fact in controversy, it should go to the jury. It would be a narrow rule, and not conducive to the ends of justice, to exclude it on the ground that it did not afford full proof of the nonexistence of the disputed fact." Insurance Co. v. Weide, 11 Wall. 438, 440, 20 L. Ed. 197.

"As has frequently been said, great latitude is allowed in the reception of circumstantial evidence, the aid of which is constantly required, and, therefore, where direct evidence of the fact is wanting, the more the jury can see of the surrounding facts and circumstances the more correct their judgment is likely to be." Holmes v. Goldsmith, 147 U. S. 150, 164, 13 Sup. Ct. 288, 292, 37 L. Ed. 118.

"There are many circumstances connected with a trial, the pertinency of which a judge, who has listened to the testimony and observed the conduct of the parties and witnesses, is better able to estimate the value of than an appellate court, which is confined in its examination to the very words of the witnesses, perhaps imperfectly taken down by the reporter." Mr. Justice Brown in Moore v. United States, 150 U. S. 57, 60, 14 Sup. Ct. 26, 37 L. Ed. 996.

In Thiede v. Utah, 159 U. S. 510, 16 Sup. Ct. 62, 40 L. Ed. 237, a husband was convicted of murdering his wife. There was no direct proof of the crime. Witnesses testified to hearing the deceased scream at several times; to seeing her with black eyes and a bruised face; to her eyes looking red; to her crying on several occasions, and appearing alarmed and scared; and to bruises and discolorations of her body. The objection was that the witnesses did not connect the accused with the appearances or testify that he caused them. The court said:

"It is true these matters do not constitute direct evidence of ill treatment or a long-continued quarrel, but they are circumstances which, taken in connection with the testimony of what was seen and heard passing between the defendant and his wife, were fairly to be considered by the jury in determining the truth in respect thereto. Whether the relations between the defendant and his wife were friendly or the reverse was to be settled, not by direct or positive but by circumstantial evidence, and any circumstance which tended to throw light thereon might fairly be admitted in evidence before the jury."

And the ill treatment by the accused of the deceased and the feeling between them was held admissible as bearing on the motive, and tending "to rebut the presumed improbability of a husband murdering his wife."

In Clune v. United States, 159 U. S. 590, 592, 16 Sup. Ct. 125, 126, 40 L. Ed. 269, Mr. Justice Brewer, speaking of circumstantial evidence, said:

"It is familiar law that where a case rests upon that character of evidence much discretion is left to the trial court, and its ruling will be sustained if the testimony which is admitted tends even remotely to establish the ultimate fact."

"The destruction, suppression, or fabrication of evidence undoubtedly gives rise to a presumption of guilt to be dealt with by the jury." Chief Justice Fuller in Wilson v. United States, 162 U. S. 613, 621, 16 Sup. Ct. 895, 899, 40 L. Ed. 1090.

Circumstantial evidence competent and relevant upon a charge of murder is not to be excluded because it also tends to prove the ac-

cused guilty of another murder not charged. Moore v. United States, 150 U. S. 57, 61, 14 Sup. Ct. 26, 37 L. Ed. 996.

With the foregoing principles in mind, let us look at the important facts and circumstances which led the jury to believe Sorenson was guilty. Each of them was supported by substantial evidence, most of them without dispute:

(1) During the night of September 29, 1904, the safe of the post office at Van Meter, Iowa, was blown open with some violent explosive. The door of the safe was blown off, and the lining thrown out and scattered around. Money of the post office establishment and between 20 and 30 watches belonging to the jeweler and his customers which had been placed in the safe were stolen. When the burglary was discovered between 3 and 4 o'clock of the morning of September 30th, the room was still filled with the gases of the explosion. Before the assistant postmaster and his wife left the premises the previous evening, they locked the safe and all the doors and windows of the room. There was no direct testimony showing how the burglars entered, or that they were not concealed in the room at closing time. Van Meter is a town about 19 miles from the city of Des Moines. Sorenson lived in South Des Moines.

(2) About a week before the burglary Sorenson, Hodge, one Willey, and a fourth man went on a fishing trip. During a conversation in which all participated, a proposition was made to Willey that he drive Sorenson's team, which they were then using, to Van Meter and assist them in burglarizing the post office. "They said there would be a piece of money, and that there was a jewelry store there too." Willey declined. The proposition was in the presence and hearing of Sorenson, but it was not shown who made it or that Sorenson said anything in response to it.

(3) Sorenson's team and a wagon were seen in his yard at noon of the day before the night of the burglary, again in the afternoon in front of a saloon in Des Moines, there being two seats in the wagon, one being an extra one. It was again seen the next morning in Sorenson's back yard, and he was engaged in wiping down one of the horses.

(4) October 17, 1904, 18 days after the burglary, Sorenson and Hodge were arrested in the railroad yards in South Des Moines. They had just come out of a box car. There were found on their persons a small bottle of nitroglycerin, a small bottle of oil of mustard, a flash light, fuses with dynamite caps attached, separate fuses and caps, a syringe, a piece of soap, and a bunch of skeleton keys. Each had a loaded revolver. Sorenson had the nitroglycerin. These articles constituted a complete outfit for blowing open safes. Soap was shown to be commonly used to paste over the seam made by the safe door, to render the interior air-tight, a space being left into which the nitroglycerin is dropped with the aid of a syringe. It is common knowledge that a fuse is to allow withdrawal to a place of safety, and that an exploding cap gives that sudden access of temperature which is one of the methods of exploding nitroglycerin. It was shown that oil of mustard is used to put on the soles of shoes to prevent hounds from tracing the wearers. The use to which skeleton keys, revolvers,

and flash light may be put is obvious; but, if not, it is suggested by the other members of the collection. There is no evidence in the record that Hodge was a coal miner. Moreover, the evidence was undisputed that the fuses found on them were not a third as long as should be used in a coal mine. Dynamite, of which nitroglycerin is a component part, was shown to be used in mines, but there was no evidence that liquid nitroglycerin is so used.

(5) A few hours after Sorenson's arrest, and while he was in jail, his house was searched. Other caps and fuses were found. There was also found a small gold watch in a drawer on top of a folding bed. It was taken to police headquarters, and memoranda made of the numbers of the case and works by several of the officers. The following morning it was taken back and delivered to Mrs. Sorenson. Shortly afterwards the authorities received information leading them to believe the watch was among those stolen at Van Meter, but when the officers went back to get it from Mrs. Sorenson it could not be found. Willey testified it was purposely destroyed. It is said the watch when first found was not in Sorenson's possession, but in that of his wife. That is true only in the sense that, being in jail, he was absent from home and she was in charge. The identity of the watch was convincingly proved. The original records of the jeweler who first sold it showed the numbers of case and works. The purchaser presented it to his daughter, she left it with the assistant postmaster at Van Meter for repair, and he put it in the safe when he closed the post office the night of the burglary. There was other evidence of identity. It is important to note in this connection that Mrs. Sorenson's claim of ownership was wholly inconsistent with that of the assistant postmaster's customer. There was no pretense that she found the watch or bought it of some one after the burglary.

(6) While Sorenson and Hodge were in jail, and before the first trial, Mrs. Sorenson gave to witness Willey three letters written by Hodge, two of them addressed to Willey and the other to a man named Fairgraves. She requested Willey to take them to Fairgraves. The letters contained ingenious directions in detail for the fabrication of an alibi for Hodge, and yet intended to be sufficiently vague in certain particulars to protect Fairgraves from a charge of perjury. When Sorenson was released on bail he asked Willey if he had taken the letters to Fairgraves, and upon receiving an affirmative reply he asked what Fairgraves said. An account of the incident and the letters were received in evidence against Sorenson.

It is said there was no proof of a forcible breaking, and that it is as reasonable to assume the thief was concealed in the room when it was closed in the evening. This applies to the burglary only, not to the larceny, of which Sorenson was also found guilty. It is well settled that a forcible breaking may consist of a mere displacement or putting aside of any barrier against intrusion, such as the lifting of the latch and pushing open of a closed door (State v. Groning, 33 Kan. 18, 5 Pac. 446), the pushing open of a closed but unfastened transom swinging horizontally on its hinges (Dennis v. People. 27 Mich. 151), the opening of an unlatched screen door held closed by spring hinges (State v. Conners, 95 Iowa, 485, 64 N. W. 295), or by the raising of

a window sash (Frank v. State, 39 Miss. 705; State v. Herbert, 63 Kan. 516, 66 Pac. 235). The description of the interior of the premises and the character and location of the furniture and fixtures given by the assistant postmaster, the care taken to fasten the doors and windows at closing time, and the extreme improbability that men equipped as the burglars were with means to blow open a steel safe to get its contents would so unnecessarily risk detection by concealing themselves in a room in a small building, all considered, would, I think, lead a reasonable mind to believe a forcible entrance was made after the departure of the lawful custodian. See United States v. Lantry (C. C.) 30 Fed. 232, and State v. Warford, 106 Mo. 55, 16 S. W. 886, 27 Am. St. Rep. 322.

The testimony of the witness Willey is criticised. It is true he had been sent to the penitentiary for stealing butter, and was afterwards paroled by the Governor and then pardoned. It is also true that witnesses testified his reputation for truth and veracity was bad. But, after all, the weight to be given to his testimony was for the jury. They saw him and the impeaching witnesses upon the stand, and observed their demeanor while testifying, and were much better qualified to determine what credence should be accorded his testimony than an appellate court. The record shows he testified temperately, and made qualifications helpful to the accused, which, if altogether evil-minded, he would probably have omitted. Moreover, none of his testimony about the conversation on the fishing trip, the whereabouts of Sorenson's team before and after the burglary, and Sorenson's connection with the attempt to make a perjured alibi was contradicted in any way.

Complaint is made of the admission of the conversation in which it was proposed to Willey that he join in the commission of the burglary. There was evidence that it was in the presence and hearing of Sorenson. The witness testified:

"Gleason, Hodge, and Andy (Sorenson), and all of us were talking in that conversation. Which one made the proposition I can't say for sure. We were not over 15 feet apart when in that part of town."

It is said that it devolved upon the government to show to the satisfaction of the jury that the defendant heard the proposition and that he assented to it. There are two distinct errors in this contention. The rule is that if a statement is made in the presence and hearing of a person it will be presumed he heard it, there being no evidence to the contrary. The rule is founded on necessity and the impossibility of proving an actual hearing save from the mouth of the hearer. Nor was it necessary in this case to show directly that Sorenson assented to the proposition at the time. There are many cases upon this subject, each turning upon its special facts and circumstances. In some it is held an assent will be presumed, in others not. Much depends upon the character of the declaration in determining whether silence gives consent. Passing the question whether Sorenson's assent could be shown by testimony of subsequent occurrences, it is sufficient here to say that the making of the proposition in his presence and hearing was relevant as conveying information of the presence of money and jewelry in the

post office at Van Meter, if for no other purpose. If it was relevant for any purpose, it is not to be rejected because irrelevant for another. In State v. Kepper, 65 Iowa, 745, 23 N. W. 301, it was said:

"The fact that defendant knew that there was money in the house was a proper circumstance to be considered by the jury in determining whether he is the person who broke and entered it."

Complaint is also made of the admission in evidence and exhibition to the jury of the nitroglycerin, fuses, dynamite caps, etc., found on Sorenson and Hodge when arrested. As the question is one of admissibility and not of weight, I will pass by the emphasis put upon the fact that the arrest was 18 days after the burglary and the accused were then 19 miles distant from Van Meter. The evidences of the use of a violent explosive in the appearance of the door and lining of the safe, and the gases in the room soon after the burglary, in connection with the testimony as to the way nitroglycerin and other articles found on the accused were commonly used in forcing safes, constitute some proof that implements of that character were probably employed in the present case. It is said the ability to commit a crime does not evidence the act. The correct rule, however, is that physical capacity to commit a crime (Thiede v. Utah, 159 U. S. 518, 16 Sup. Ct. 62, 40 L. Ed. 237), or the possession of skill, knowledge, or familiarity with the special means employed in its commission, has a probative value. If the means are peculiar, and such as men generally are not familiar with or capable of using, evidence that an accused is so equipped is obviously admissible. People v. Brotherton, 47 Cal. 388, 402. We all know that few men are accustomed to handling nitroglycerin or familiar with its use, and few are able to force entrance into a steel safe. The fact that each separate article had a lawful use makes of course in favor of the accused, but does not render the evidence inadmissible. It is true the trial court said in its charge to the jury that this evidence might be considered as tending to show the accused were going to commit some other crime. This was evidently inadvertent, and may well be passed by, because counsel at the trial did not direct the court's attention to it by an exception, nor did they make it the subject of an assignment of error.

In Commonwealth v. Williams, 2 Cush. (Mass.) 583, on a trial for burglary, a mass of burglar's tools found in the possession of the accused were received in evidence and exhibited to the jury, though it was conceded that a portion of them were not adapted to the commission of the offense. Among them were pistols. It was held not error.

State v. Dubois, 49 Mo. 573. Upon a charge of burglary and larceny it was shown that the door of the house had been broken open with burglar's tools. As part of the evidence against the accused, it was shown that eight days after the crime was committed burglar's tools were found in a trunk belonging to him, or in his possession, and the tools were produced in court and shown to the jury. It was held that the evidence was properly admitted.

In Williams v. People, 196 Ill. 173, 63 N. E. 681, an express office in Chicago was broken into, a trunk broken open, and certain articles stolen. Evidence was admitted that when the accused was arrested 31

days later he had on his person a jimmy and punch, a pair of pliers, and a case knife.

In People v. Gregory, 130 Mich. 522, 90 N. W. 414, it was held proper to receive evidence of the finding, more than eight months after a burglary, of burglars' tools on a farm belonging to the mother-in-law of the accused, but which had been occupied by him alone, also of the finding of part of the stolen property in a room in a house in the city occupied by the accused and his wife, though she claimed it to be her room.

As to the finding of the watch in Sorenson's house 18 days after the burglary: The proof was clear and convincing that the watch was one of those stolen from the safe at the time of the burglary. No explanation consistent with that fact was given in defense. It is, however, queried whether it was admissible and sufficient (wholly different things) to authorize the jury to infer defendant's connection with either the burglary or the larceny, and as Sorenson had been placed in jail a few hours before his house was searched, and his wife was then in charge, the lack of civil unity of the marital relation is employed to make the possession of the watch her possession, not his.

The possession of stolen property is always admissible on a charge of larceny, and when the property was stolen in connection with a burglary it is also admissible on a charge of the burglary. The probative value of such evidence varies with the circumstances attending the possession, and the proximity or remoteness in point of time from the commission of the crime. If the possession is recent and unexplained, it may have a prima facie effect; if not impaired by other evidence, it may be given controlling weight and alone justify conviction. This principle has been applied in a murder case, the accused being found in possession of property of the deceased two weeks after he was killed (Wilson v. United States, 162 U. S. 613, 16 Sup. Ct. 895, 40 L. Ed. 1090), and on an indictment for arson, the proof being that property in the house at the time it was burned was soon afterwards found in the possession of the accused (Rickman's Case, 2 East, P. C. 1035). But if the possession is not recent, it is still to be received as a circumstantial fact, and its value determined by the jury in the light of all the evidence. "The lapse of a long interval opens a greater possibility of innocent explanation, and may prevent the raising of a presumption of law, but does not alter the relevancy of the fact." 1 Wigmore, Ev. § 152. And the evidence is also admissible though the possession is not personal or exclusive, as when the fruits of the crime are found in a place frequented by the accused, or with an associate or companion, accompanied by evidence of complicity. The admissibility of the fact of possession and its circumstances on the one hand, and the probative effect thereof on the other, are two different things. The range of the latter is from prima facie proof sufficient for conviction to a remote circumstantial relevancy the weight of which depends largely upon its association with other circumstances. But in every case the evidence should be admitted for the consideration of the jury when it has any tendency to show the probability of a connection between the accused and the commission of the crime. These principles are elementary, and

are so well founded in reason and good sense that one might forbear repeating them did they not appear to afford ample justification for the action of the trial court in the case at bar. Some of the cases selected at random from many will illustrate their application.

Randolph v. State, 100 Ala. 142, 14 South. 792. A man and his wife were jointly indicted and tried for burglary. Thirteen months after the commission of the offense their house was searched when the husband was in jail on another charge, and some of the stolen property was found, though a search made just previous to his arrest failed to reveal anything. It was held this was some evidence for the jury to consider on the charge against him.

In People v. Van Dam, 107 Mich. 425, 65 N. W. 277, the house of defendant, who was accused of burglarizing a store, was searched, during his temporary absence, 26 days after the crime was committed, and several articles of merchandise were found. Evidence was admitted showing this fact and the similarity of the articles in kind, shop wear, and exposure to those remaining in the store.

In Bryan v. State, 62 Ga. 179, a burglary and larceny were both committed. The possession of the property 12 days after the theft, not satisfactorily explained, was held admissible on the charge of burglary.

In Frazier v. State, 135 Ind. 38, 34 N. E. 817, the claim of the prosecution was that the accused, together with Manning and others, committed the burglary and larceny. As to the admission of certain evidence, it was said:

"We do not think the court erred in permitting the state to prove that a part of the stolen property was found on Manning at the time of his arrest, and his conduct tending to show that he was one of the thieves. Of course, such proof would not have been admissible for the purpose of proving a conspiracy to commit the crime charged, because it occurred after the crime was committed, but we think, when taken in connection with the appellant's association with Manning, both before and after the crime, that it was a circumstance proper to be considered by the jury in determining the guilt of the appellant."

In Malachi v. State, 89 Ala. 134, 8 South. 104, a coat belonging to deceased was found in possession of the accused three months after the homicide. It was left to the jury to consider in connection with the testimony of an accomplice who swore to the killing but not to the taking of the coat.

In Branson v. Commonwealth, 92 Ky. 330, 17 S. W. 1019, evidence was admitted that not long after a burglary and larceny part of the stolen goods were found in the house of the accused, part in the house of his father, and part in the possession of a brother-in-law.

Considine v. United States, 50 C. C. A. 272, 112 Fed. 342, was a case of forcibly breaking into a building in Ohio, used in part as a post office. Among the articles stolen were some money order blanks. The crime was committed in October. A witness engaged in manufacturing rubber stamps testified that about November 10th the accused purchased from him such a stamp, together with type and a pad to be used with it. The accused was arrested in Chicago December 25th, just after attempting to pass a fraudulently stamped and counterfeited money order. In a valise in his possession was the outfit he purchased from

the witness in November, and another counterfeited order was on his person. The admissibility of this evidence was challenged. Mr. Justice Day, then Circuit Judge, speaking for the Court of Appeals, said, "More cogent evidence of guilt could hardly be conceived," and the general rule was announced that the possession of goods recently stolen is entitled to more or less weight as an inculpatory circumstance depending on the facts of each case, and unless rebutted by the evidence or the explanation of the accused the jury may act upon it, not only where the charge is theft, but also where it is burglary by which the theft was accomplished.

As to Sorenson's connection with the attempt to fabricate an alibi for Hodge: The evidence was undisputed that Hodge while in jail wrote the letters containing directions to Fairgraves for the commission of perjury in establishing an alibi, that the letters in some undisclosed way came into the possession of Mrs. Sorenson, that she gave them to Willey and requested him to take them to Fairgraves, and that when Sorenson was released on bail he asked Willey if he had taken them to Fairgraves and what the latter said. There was evidence of association and companionship between Sorenson and Hodge before and after the burglary. They were together on the fishing trip when the proposition concerning the post office at Van Meter was made, and they were together when arrested, each having parts of a safe-blowing outfit in his possession. They were jointly indicted and tried. It is obvious that an alibi for Hodge, while primarily for his benefit, would also be of distinct advantage to Sorenson. If it were shown Hodge could not have been at Van Meter the night of the burglary, the case against Sorenson would have been appreciably weakened, and Sorenson's connection with the attempt to secure perjured evidence was therefore in his own interest as well as in that of his codefendant. The fabrication of evidence, the inference from which is said to be one of the simplest in human experience, is always receivable against an accused. If Sorenson's connection with a fabricated alibi for Hodge is not evidence against him, each could help the other in that way with impunity so far as concerned the proof of crimes for which they were jointly indicted. This would certainly present an anomalous condition in the law of evidence. In State v. Hudson, 50 Iowa, 157, testimony was admitted to show that defendant furnished money to enable his codefendant, who had admitted his guilt, to escape.

A precedent narrowly restricting the use of circumstantial evidence upon which reliance must be had in a great proportion of the cases greatly hampers and impedes the administration of justice. The modern tendency is to expand the rules of evidence, not to contract them, and to concede to the trial court a reasonable exercise of discretion in receiving proofs which will not be interfered with on appeal. Of course an accused should not be compelled to meet evidence that is hearsay, or that has no tendency to connect him with the commission of the offense charged. But society, also, has its rights.