SHEA et al. v. UNITED STATES.

(Circuit Court of Appeals, Sixth Circuit. October 13, 1916.)

No. 2818.

1. CRIMINAL LAW ⬥113—FEDERAL COURTS—DISTRICT COURT—JURISDICTION.
Cr. Code (Act March 4, 1909, c. 321, 35 Stat. 1096 [Comp. St. 1913, § 10201]) § 37, formerly Rev. St. § 5440, provides that, if two or more persons conspire to commit any offense against the United States and one or more of such persons do any act to effect the object of the conspiracy, each of them are guilty, while Rev. St. § 731, declares that, when any offense against the United States is begun in one judicial circuit and completed in another, it shall be deemed to have been committed in either, and may be punished in either district as if wholly committed therein. Defendants entered into a conspiracy in Toledo, Ohio, where one of them

⬥For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

was located for some time, and pursuant to such conspiracy inserted an advertisement for a farm in a Michigan paper. The owner of a farm, who replied by mail to the advertisement, was induced to come to Toledo, and was there led to bet on horse races in a bogus turf exchange, the conspirators representing to him that they were in communication with a syndicate controlling most of the horses, that the results of the races were fixed in advance, and that they were given by the management the names of the horses which were picked to win. *Held*, that as some of the overt acts of the conspiracy to defraud in which the mails were used, including the consummation of the conspiracy, their victim of course losing, occurred in Ohio and others in Michigan, the District Court of Ohio had jurisdiction of a prosecution for the offense.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 190, 232; Dec. Dig. ☞113.]

2. CRIMINAL LAW ☞371(1)—EVIDENCE—OTHER OFFENSES.

In such case, proof that defendants operated another bogus turf exchange in a different building in Toledo, fleecing another victim whom they secured through personal solicitation of one of their number who became acquainted with him, instead of advertising for replies, is admissible in evidence, the schemes in the main being the same, to show defendants' intent and motive, notwithstanding such evidence showed defendants to be guilty of another offense.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 830, 831; Dec. Dig. ☞371(1).]

3. CRIMINAL LAW ☞369(1)—EVIDENCE—ADMISSIBILITY.

In such case, as the evidence tended to show that the bogus turf exchanges in both buildings were under common ownership and operation and as part of a common scheme or plan, evidence of the operation of the second exchange was admissible to raise an inference that those operating it were also parties to the first scheme to defraud.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 822; Dec. Dig. ☞369(1).]

4. CRIMINAL LAW ☞371(1)—EVIDENCE—ADMISSIBILITY.

In such case, though proof of intent was not necessary, the evidence is admissible; the fact that the jury may find a case without it being no ground for rejection.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 830, 831; Dec. Dig. ☞371(1).]

5. CRIMINAL LAW ☞369(1)—EVIDENCE—OTHER OFFENSES.

Proof that defendants participated in a scheme to induce a bank to advance money for the temporary purchase of corporate stocks which they claimed they had knowledge would be bought in at an advance was admissible to show the intimate relations between the parties to the alleged conspiracy.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 822; Dec. Dig. ☞369(1).]

6. CRIMINAL LAW ☞1169(11)—APPEAL—HARMLESS ERROR.

But in such case, where the court in admitting evidence of the confidence game remarked that it might be considered as tending to show that defendants were in that instance attempting to defraud, and further charged that certain testimony and exhibits might be considered on the presumption of innocence, and whether or not defendants were all birds of a feather, the admission of the evidence, in view of the charge referred to, was prejudicial error tending to cause a conviction on charges not included in the indictment.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 3137; Dec. Dig. ☞1169(11).]

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In Error to the District Court of the United States for the Northern District of Ohio; John M. Killits, Judge.

John J. Shea and others were convicted for conspiracy to use the United States mails in pursuance of a scheme to defraud, and they bring error. Reversed and remanded.

See, also, 224 Fed. 426, 140 C. C. A. 120.

H. W. Fraser, of Toledo, Ohio, for plaintiffs in error.

John S. Pratt, Asst. U. S. Atty., of Toledo, Ohio.

Before KNAPPEN and DENISON, Circuit Judges, and SESSIONS, District Judge.

KNAPPEN, Circuit Judge. Plaintiffs in error complain of their conviction upon indictment, under section 37 of the Criminal Code of the United States, for conspiracy to use the United States mails in pursuance of a scheme to defraud, condemned by section 213 of the Criminal Code (Comp. St. 1913, § 10383).

On the trial the following facts appeared without dispute:

On August 14, 15, and 16, 1914, there was published in a Detroit newspaper the following notice:

"Gentleman will invest from $30,000 to $50,000 in modern fertile farm; must be unincumbered. State size and acreage and full particulars in first letter. Owners only. Agents need not answer. Address Box R-20, News."

The advertisement was read on August 16, 1914, by one Rundle, a farmer living in Oakland county, Mich., who replied by mail to the advertisement. Two or three weeks later he was called upon at his home by one Collier, who claimed to be the mining engineer (from California) of "the Guggenheims," and to be representing them in the prospective purchase of a farm to be occupied by their nephew. Pursuant to telegram from Collier, Rundle met the latter at Toledo, Ohio, September 21st, and was there introduced by him to one "Sherman" (said to be defendant Arthur), who was represented to be the secretary of Mr. Guggenheim. The sale was there agreed upon, "Sherman" giving Collier what purported to be a certified check for $10,000 to be applied on the price when the sale should be consummated. Afterwards Collier and Rundle met on the street in Toledo a man called "Hudson," whom Collier claimed to know. The result was that the three went to rooms in the Denison building fitted up to represent a turf exchange, where "Hudson" explained that the "syndicate" owned most of the horses which took part in the races, and controlled their result, wiring Hudson each day by cipher code which horses to bet on. After Collier had "won" a bet of a dollar, he pretended to bet the $10,000 "certified check" which Arthur had given him, and to which "Hudson" appeared to add another $10,000. This $20,000 "bet" was announced as won, together with a profit of $50,000. Payment of the $70,000 ticket was refused until it could be ascertained whether the $10,000 "certified check" was good. Collier professed unwillingness to have it cashed for fear the Guggenheims would learn where it was done, and proposed to Rundle to give him a part of the profit on the bet if he would help raise the $10,-

000. Rundle accordingly went home and raised $3,000, returned to the "turf exchange," and there paid the amount to Collier, who claimed to have meanwhile secured $7,000 from "Sherman" (Arthur). After Rundle had, at Hudson's request, bet $500 of the latter's money (winning $1,000, which was apparently paid to Hudson), Collier claimed that he (Collier) had bet not only the $10,000 (of which Rundle's $3,000 was a part), but the $70,000 "ticket" and had lost the entire amount through an alleged misunderstanding of the betting instructions. Rundle was thus swindled out of his $3,000. The "turf exchange" was shown to have been simply a fraudulent pretense; the telephone and telegraph instruments connecting nowhere.

One Millard, a farmer living near Rundle, also saw the advertisement in question in August and answered it by mail. He was later called upon by Collier on September 5th and 17th, who told a "Guggenheim" farm-purchase story in substance as related to Rundle. The Millard transaction went no further than an agreement upon the purchase price, because of Millard's refusal to add Collier's commission to the price of the farm, and to bring the commission with him to Toledo.

The indictment charged as participants in the conspiracy not only the three plaintiffs in error here, but Arthur, Hathaway, Collier, Taylor, and others; the conspiracy charged being a scheme to defraud by substantially the means used in the case of Rundle (including false claims that Collier and "Sherman" represented the Guggenheims), the overt acts charged (aside from the publication and purpose of the advertisement) relating to the Rundle transaction. None of the defendants except Shea, Brereton, Homer, Hathaway, and Arthur seem to have been taken into custody. Arthur pleaded guilty. Shea, Brereton, Homer, and Hathaway were convicted and sentenced. Hathaway does not prosecute error.

There was substantial testimony tending to show that each of the five defendants named participated in the conspiracy. (The intention to use the mails was fairly inferable from the advertisement itself, which brought at least two responses by mail.) Homer is shown to have purchased furniture for the turf exchange rooms in the Denison building, and to have personally rented the rooms in question, under the name of "Fuller." There was testimony identifying Hathaway as the "manager" of the turf exchange in the Denison building at the time of the Rundle transaction and as having been with Homer when the rooms were rented. There was a partial identification by Rundle of defendant Brereton as the "Hudson" who assisted in the transaction in the Denison building turf exchange. Shea had an office in the Spitzer building, which seems to have been headquarters for defendants Homer, Baldwin, Adams, and perhaps others. In this office were found at the time of the arrest (October 5, 1914) suit cases containing what was apparently the paraphernalia of the turf exchange in the Denison building, as well as in the Nasby building later referred to (these exchanges having been then lately dismantled), including cloth "blackboards," telephone and telegraph instruments, racing forms, and paper cut the size of United States bills, and with

wrappings, bearing the printed name of a bank. Paper "money" of this kind was shown to have been cut for defendant Taylor in the summer of 1914. There was evidence that defendant Shea was in the Nasby building on the day the furniture was moved out, and he was identified by Hoblitzel as the cashier of the "turf exchange" in the Nasby building (to be hereafter mentioned). There was also evidence having some tendency (though by no means conclusive) to identify Shea as the one who delivered the advertisement at the newspaper office in Detroit on August 13th.

[1] 1. Defendants asked direction of verdict in their favor upon the ground that the District Court for the Northern District of Ohio (in which district Toledo is situated) had no jurisdiction of the offense. Section 37 of the Criminal Code (formerly section 5440 of the Revised Statutes) provides that:

"If two or more persons conspire * * * to commit any offense against the United States * * * and one or more of such parties do any act to effect the object of the conspiracy, each of the parties to such conspiracy shall" be punished in the manner prescribed.

Section 731 of the Revised Statutes provides that:

"When any offense against the United States is begun in one judicial circuit and completed in another, it shall be deemed to have been committed in either, and may be dealt with, inquired of, tried, determined, and punished in either district, in the same manner as if it had been actually and wholly committed therein."

Although a mere conspiracy, without an overt act done under it, is not criminally punishable under section 37 of the Criminal Code, yet the rule is now settled that, in view of that section and section 731 of the Revised Statutes, prosecutions for conspiracy may be maintained either in the district in which the conspiracy was entered into, or in any district in which an act was done to effectuate the object of the conspiracy. Hyde v. Shine, 199 U. S. 62, 76, et seq., 25 Sup. Ct. 760, 50 L. Ed. 90; Hyde & Schneider v. United States, 225 U. S. 347, 356, et seq., 32 Sup. Ct. 793, 56 L. Ed. 1114, Ann. Cas. 1914A, 614; Brown v. Elliott, 225 U. S. 392, 400, et seq., 32 Sup. Ct. 812, 56 L. Ed. 1136; Joplin Mercantile Co. v. United States, 236 U. S. 531, 535, et seq., 35 Sup. Ct. 291, 59 L. Ed. 705; United States v. Rabinowich, 238 U. S. 78, 86, et seq., 35 Sup. Ct. 682, 59 L. Ed. 1211.

The indictment charged that the conspiracy was entered into at Toledo, and three of the overt acts alleged are charged to have been committed there. We think the record would naturally justify an inference that the conspiracy was entered into at Toledo; Shea had lived there for several months and had an office there from which he carried on a so-called advertising agency. Adams, who apparently lived in Toledo, acted for Shea in renting the office mentioned, and apparently spent considerable time there. Both Arthur and Hathaway seem to have been intimate with Shea and in the habit of making his office their headquarters. The connection of Homer and Hathaway with the renting and furnishing of the "turf exchange" has already been mentioned, as well as the making in Toledo of the "paper money" on Taylor's order.

But the acts done in Toledo in furtherance of the conspiracy were enough to give jurisdiction to the court below, which was not lost by the previous closing of the "door of repentance" through the taking of letters from the mails in another jurisdiction. The motion to direct verdict was properly denied.

[2-4] 2. Complaint is made of the admission of testimony relating to the so-called "Hoblitzel incident," which in substance, according to the tendency of the proof, was this: Hoblitzel, who did not live in Toledo but was there on business of his own, fell in with a stranger (said to be defendant Brown) with whom he became intimate, and by whom he was later introduced to a man (claimed to be defendant Collins) who pretended to be acting for a syndicate of gamblers in betting on the turf exchange, with the result that Hoblitzel was taken to a fictitious "turf exchange" in the Nasby building, where he was ultimately defrauded of $5,000 through a transaction of the same general nature as that of Rundle, including a final bet on the wrong horse; the main features of difference as respects the turf exchange transaction, and so far as important here, being that the exchange in Hoblitzel's case was in the Nasby building instead of in the Denison building, and that it was Hoblitzel's check for $5,000 which had to be made good before the previous winning could be paid over instead of the certified check of Collier's in the Rundle case. Hoblitzel's testimony tended to identify Taylor as manager and Shea as one taking part in the operations of the exchange. The admission of this testimony is said to violate the rule which forbids testimony of other and distinct offenses, and not to fall within the exception which admits evidence of acts of a similar character at or about the same time, with like alleged fraudulent purpose, as bearing upon defendant's motive or intent; for example, as proving a fraudulent or criminal scheme. Mutual Ins. Co. v. Armstrong, 117 U. S. 591, 598, 6 Sup. Ct. 877, 29 L. Ed. 997; Wood v. United States, 16 Pe. 342, 360, 10 L. Ed. 987; Olson v. United States (C. C. A. 8) 133 Fed. 849, 854, 67 C. C. A. 21; Sapir v. United States (C. C. A. 2) 174 Fed. 219, 98 C. C. A. 227; Breese v. United States (C. C. A. 4) 203 Fed. 824, 829, 122 C. C. A. 142; Worden v. United States (C. C. A. 6) 204 Fed. 1, 5, 122 C. C. A. 315. The exception referred to is peculiarly applicable to charges of conspiracy to defraud.

The Hoblitzel transaction is said to differ essentially from the charge in the indictment before us, especially in that the Hoblitzel incident involved neither the pretended purchase of a farm nor the use of the mails. But speaking broadly, the wrong charged is a conspiracy to defraud, by fake betting on pretended horse races. The other two features just referred to are merely means to that end. In ascertaining, therefore, the motives or intentions of defendants in the Rundle and Millard transactions, and whether those transactions evidenced a criminal scheme, a similarity of means in getting the victim into the exchange is not the necessary test of relevancy, nor is such similarity so pertinent a test as the identity of the means finally resorted to, viz. the fake horse-race betting. The Hoblitzel incident directly tended to show the existence of a scheme, participated in by several of the

defendants, to defraud by such bets—a scheme even broader than in Rundle's experience, because involving a second exchange and connecting defendants not directly shown to have been concerned with the Rundle incident. Hoblitzel's experience occurred on August 17th, and during the few days immediately following, and so had a direct bearing upon the motives and intentions of defendants in the Rundle turf exchange transaction, and thus upon the question of the existence or nonexistence of the conspiracy charged. It is not a complete answer that proof of intent was not necessary, because the facts of the Rundle transaction showed fraudulent intent. Evidence is not made inadmissible because a jury might have found a case proven without it. Moreover, as the record would sustain a finding that the exchanges in the Nasby and Denison buildings, respectively, were under common ownership and operation, and part of a common scheme or plan, it was open to inference that those operating at the exchange in the Nasby building were also interested in that maintained in the Denison Block, and were thus involved in the conspiracy charged, and the evidence was admissible for that purpose. The proof was thus not merely of a "similar offense." Parker v. United States (C. C. A. 2) 203 Fed. 950, 952, 122 C. C. A. 252; People v. Grutz, 212 N. Y. 72, 77, 105 N. E. 843, L. R. A. 1915D, 229, Ann. Cas. 1915D, 167; People v. Molineux, 168 N. Y. 264, 293, 61 N. E. 286, 62 L. R. A. 193.

[5, 6] 3. There was admitted, against defendants' objection and exception, testimony relating to the so-called Kehoe incident. This testimony tended, at the most, to show an attempt by Shea, Homer, and Brereton to defraud, by means of a scheme whereby some bank was to be induced to advance money for the temporary purchase of a large block of the stock of the Consolidated Radium Mining Company, under a claim of inside information that the mining company stood ready to buy the stock at a price much greater than the block in question could be had for. The alleged fraudulent negotiations were opened on October 2, 1914, with Kehoe, who, scenting a confidence game, exposed it three days later, before any fraud was effected. The arrests in the instant case followed at once.

One objection to the admission of this testimony is that the fraud sought to be shown was of an entirely different nature than that charged in the indictment, and was thus directly within the general rule which forbids proof of the commission by defendants of crimes distinct from and independent of the crime charged.

In admitting the Kehoe testimony, the court said it might be considered "as tending to show that the particular defendants named in the transaction were attempting to defraud Kehoe," and apparently in connection with evidence of the intimacy of the defendants jointly indicted and their association in the fraudulent transaction. As only Shea, Homer, and Brereton are prosecuting error, any question of the effect of the Kehoe testimony on the other defendants is, of course, out of the case. Properly limited as to purpose, proof of intimate relations between plaintiffs in error would be relevant. But we think the jury would naturally understand from the admission of the testimony, without other limitations than stated, that they were at liberty

to consider the alleged guilty connection of plaintiffs in error with the Kehoe matter as evidence of their guilt of the conspiracy charged in the indictment. Indeed, in the charge to the jury, to the statement that certain testimony and exhibits might be considered as determining whether the defendants are "all birds of the same feather," and "with the view of determining the likelihood of their being engaged in just such a transaction as charged in this indictment," the court added:

"Because the very first inquiry that any honest juror will make, when he is told that these defendants are protected by the presumption of innocence, is this: With this presumption of innocence shielding them, is it likely that he would engage in any such scheme as that charged in this indictment? So, inevitably, it is competent for the jury to get any index that is available to the character of the defendant on trial, because the kind of a man the defendant is is a very important question affecting the ultimate question whether he is guilty of the crime charged."

No effective exception was taken to the charge. But we think the instruction merely illustrates the effect which proof that a defendant has been guilty of other offenses (although separate and distinct from that for which he is on trial) would naturally have upon the mind of a juror. While testimony otherwise competent and relevant is not to be excluded because it may incidentally show a defendant guilty of another offense (Moore v. United States, 150 U. S. 57, 61, 14 Sup. Ct. 26, 37 L. Ed. 996; Tucker v. United States [C. C. A. 6] 224 Fed. at page 840, 140 C. C. A. 279, and cases there cited), yet, subject to certain limitations, the law does not permit proof of other and entirely distinct offenses merely for the purpose of showing that the defendant has a generally criminal disposition or character, or a character likely to make him commit the crime for which he is on trial (Prettyman v. United States [C. C. A. 6] 180 Fed. 30, 36, 103 C. C. A. 384, and cases there cited; Boyd v. United States, 142 U. S. 450, 458, 12 Sup. Ct. 292, 35 L. Ed. 1077; Hall v. United States, 150 U. S. 76, 80, 14 Sup. Ct. 22, 37 L. Ed. 1003; Sorenson v. United States [C. C. A. 8] 168 Fed. 785, 794, 94 C. C. A. 181; Fish v. United States [C. C. A. 1] 215 Fed. 544, 551, 132 C. C. A. 56, L. R. A. 1915A, 809; People v. Schweitzer, 23 Mich. 301, 303).

We have given considerable thought to the question whether, in view of the showing of intimate connection between plaintiffs in error, the Kehoe incident was admissible as tending to show a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the other, such proof falling within the recognized exceptions to the general rule excluding proof of similar offenses (People v. Molineux, supra, 168 N. Y. at page 293, 61 N. E. 286, 62 L. R. A. 193); or, on the theory that the Kehoe and Rundle schemes should be considered as merely species of a genus which embraced confidence games generally, and thus that proof that plaintiffs in error were engaged in the Kehoe transaction would tend to identify them as likewise engaged in the Rundle affair. But the Kehoe matter was of an entirely different nature from that for which the defendants were on trial, except as both may be classified generally as confidence games. And we are constrained to think that evidence of the alleged fraudulent mining-stock

scheme has no direct tendency to prove a scheme to defraud through fictitious horse-race bets, except as it tends to show the character or disposition or manner of life of plaintiffs in error to be such as to make them likely to commit the fraud charged in the indictment.

We therefore think the admission of the testimony in question worked prejudicial error for which the judgment of the District Court must be reversed, as respects plaintiffs in error, and the record remanded to that court, with directions to award them a new trial.