### GRANT et al. v. UNITED STATES.

(Circuit Court of Appeals, Sixth Circuit. November 10, 1920.)

#### No. 3346.

1. **Criminal law ⬅1177—Judgment sustained by one of two counts sufficient.**

   A judgment of conviction, sustained by the second count, should not be reversed for failure of proof on the first count, where the conviction was upon both counts, and the sentence imposed could have been based upon either count.

2. **Post office ⬅48(4)—Indictment regarding fraud in using mails sufficient.**

   An indictment that defendants used the mails to defraud by trickery, etc., to the grand jurors unknown, *held* sufficient against the objection that the specific trickery and chicanery to be employed were not stated, in view of Comp. St. § 1691, and Judicial Code, § 269, as amended by Act Feb. 26, 1919 (Comp. St. Ann. Supp. 1919, § 1246), prohibiting reversal for nonprejudicial error.

3. **Indictment and information ⬅59—Purpose of indictment stated.**

   The object of an indictment is to fairly inform the accused of the charge against him, so as to enable him to prepare his defense and protect him against further prosecution.

4. **Post office ⬅50—Whether one accused of fraud in use of mails received a letter a jury question.**

   In a prosecution for using the mails to defraud, evidence that a special delivery letter addressed to defendant was delivered at the hotel at which defendant was stopping, that it was later given to him, and that he accepted and acted upon it, *held* to make a jury question whether he received the letter in execution of the fraudulent scheme.

5. **Post office ⬅35—Receiving of letter charged to confederates.**

   If several defendants were associated in a scheme to defraud by use of the mails, the act of one in receiving a letter in the course of the scheme was the act of the other defendants also.

6. **Post office ⬅50—Evidence makes participation in scheme to defraud a jury question.**

   In a prosecution for using the mails to defraud, evidence that the defendant had previously been involved in a similar scheme, and that he had dealings with the other defendants during the course of the present scheme to defraud, etc., *held* to make his participation a jury question.

7. **Post office ⬅35—Success of scheme unnecessary to establish guilt.**

   In a prosecution for using the mails to defraud, a conviction may be had, although the scheme was unsuccessful.

8. **Criminal law ⬅372(1)—Evidence regarding similar swindle admissible, to show participation in fraud involved.**

   In a prosecution for using the mails to defraud, evidence that a defendant had been involved in a similar scheme two years previously is

---

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

admissible to show his participation in the present swindle, provided the jury was convinced a common plan existed among defendants to perpetrate a swindle, even though the previous fraud did not involve use of the mails.

**9. Post office ☜49—Letter and telegrams held admissible.**
    In a prosecution for using the mails to defraud, a special delivery letter and telegrams addressed to defendant *held* admissible, under conflicting testimony as to when and by whom they were sent.

In Error to the District Court of the United States for the Eastern District of Kentucky; Andrew M. J. Cochran, Judge.

Fred B. Grant, William F. Silva, and John Connell were convicted of using the mails to defraud, and bring error. Affirmed.

John B. O'Neal, of Covington, Ky. (Maurice L. Galvin, of Cincinnati, Ohio, on the brief), for plaintiffs in error.

Thomas D. Slattery, U. S. Atty., of Covington, Ky.

Before KNAPPEN, DENISON, and DONAHUE, Circuit Judges.

KNAPPEN, Circuit Judge. Plaintiffs in error, together with one Goulet and one Davis, were indicted under section 215 of the Criminal Code (Comp. St. § 10385), for using the mails to promote a scheme to defraud. Davis was not brought before the court. A demurrer to each of the two counts of the indictment was overruled. Each of the other four defendants pleaded not guilty and the case went to trial. A motion at the close of the evidence to direct verdict of not guilty was overruled, and the case submitted to the jury. Goulet was acquitted; plaintiffs in error were each convicted and sentenced. This writ is to review the judgment on conviction.

[1] 1. *The Motion to Quash.*—The same scheme to defraud was set out in each count of the indictment. The differences related to the use of the mails—the first count charging the causing of the letter in question to be deposited in the United States post office at West Hoboken, N. J. The second charged the taking and receiving of that letter from the United States post office at Newport, Ky., in which district plaintiffs in error were indicted. The conviction was upon both counts, and the judgment imposed could have been inflicted upon either. If, therefore, the second count was good, the judgment should not be reversed on account of any defect in or failure of proof as to the first count. Abrams v. United States, 250 U. S. 616, 619, 40 Sup. Ct. 17, 63 L. Ed. 1173; Hardesty v. United States (C. C. A. 6) 168 Fed. 25, 26, 93 C. C. A. 417; Bennett v. United States (C. C. A. 6) 194 Fed. at page 633, 114 C. C. A. 402.

[2, 3] The gist of the alleged scheme was the swindling of one Kaiser out of $25,000 by fake betting on horse races, a scheme in many of its salient features not unlike that involved in Shea v. United States, 236 Fed. 97, 149 C. C. A. 307; Id., 251 Fed. at page 442, 163 C. C. A. 458. The details of the alleged scheme may be sufficiently summarized as embracing the making of Kaiser's acquaintance at Mt. Clemens, Mich.; the representation that Connell had been winning large sums of money on horse races (due to alleged advance information upon the

outcome thereof); the inducing of Kaiser to bet $50 on a pretended horse race; the pretense that he had won that bet; the representation that the pool room was closed for the day, and that the alleged proprietor of the Mt. Clemens pool room would forward to a pool room at Newport, Ky., the ticket for the alleged winning of $6,000; the persuading of Kaiser to accompany plaintiffs in error to the Newport pool room; the pretended receipt by Connell from Davis of the $6,000 in question; the persuading of Kaiser to permit Connell to bet the whole of that sum on another pretended horse race, and so on until winnings aggregating $75,000 should appear to be made (of which Kaiser's share was to be $25,000); a representation that under the laws of Kentucky the winner on a horse race in that state must produce therein a sum of money equal to the amount of his winnings before he could collect them; the persuading of Kaiser to go to his home in New Jersey, get $25,000, and bring it back in the form of a bank draft; the contriving to have the draft deposited in and collected by a Newport bank; and the fraudulent obtaining by defendants of either the draft or its proceeds.

The indictment contained due allegations of the false and fraudulent character of the material pretenses and representations charged. The only allegation in the indictment as to the specific means by which defendants were to fraudulently obtain possession of the draft or its proceeds is that—

"By trickery, artifice, chicanery, cheating, and by making false and fraudulent statements, representations and pretenses, and by other artifices, false representations, pretenses and deceptions, to the grand jurors unknown, to the said Fred Kaiser, the defendants would obtain possession of the said draft," etc.

The demurrer challenges the sufficiency of this statement. The demurrer was properly overruled. The statement in the indictment that the specific trickery and chicanery to be employed were unknown to the grand jurors expressed a situation not inherently unnatural, and, unless shown to be untrue, does not make the indictment defective. Durland v. United States, 161 U. S. 306, 314, 315, 16 Sup. Ct. 508, 40 L. Ed. 709. The object of an indictment is to fairly inform the accused of the charge against him, and sufficiently to enable him to prepare his defense and protect him against further prosecution therefor. Daniels v. United States (C. C. A. 6) 196 Fed. 459, 465, 116 C. C. A. 233; Bettman v. United States (C. C. A. 6) 224 Fed. 819, 826, 140 C. C. A. 265. The indictment, in our opinion, meets that requirement. Its frame is such as to preclude possibility of another prosecution for the same offense, as well as to enable the accused to prepare to meet the charge. The judgment should not be reversed on account of a criticism so obviously technical and unsubstantial. U. S. Comp. Stat. (1916) § 1691; Judicial Code, § 269, as amended February 26, 1919 (40 Stat. 1181, c. 48 [Comp. St. Ann. Supp. 1919, § 1246]); West v. United States (C. C. A. 6) 258 Fed. 413, 415, 169 C. C. A. 429; Grandi v. United States (C. C. A. 6) 262 Fed. 123, 124.

[4, 5] 2. It was not error to overrule the motion for directed ver-

dict. There was substantial testimony tending to support each of the allegations in the indictment necessary to conviction.

(a) As to the receipt of the letter: Kaiser had left Newport for West Hoboken on July 30th, for the purpose of raising the $25,000. On August 1st he wired Grant that he was finding it difficult to get the full amount. To this Connell wired reply that Grant had arranged his part, to leave no stone unturned, and to wire when he should leave. On August 2d Kaiser mailed at West Hoboken a special delivery letter, addressed to "Mr. F. B. Grant, Vendome Hotel, Corner 9th St. and Washington St., Newport, Kentucky," stating, among other things, that he saw no reason why he should bring to Newport so much money, and asked whether the winning card could not be transferred to New York. This letter was brought to the hotel on August 3d and receipted for by the hotel proprietor's niece; on the evening of that day the proprietor's nephew brought the letter to defendant Grant while on the hotel porch; Grant then and there opened the letter, but on account of the darkness took it to his room, read it, and in reply wired Kaiser to bring the draft by the following Tuesday without fail, and that nothing more was required. The letter was retained by Grant, who later wired Kaiser, inquiring what the latter had done and on what train he would leave. Kaiser advised Grant by wire of the date he should start, came on to Cincinnati, and deposited the money in a bank there.

We think there was substantial testimony warranting the conclusion that the letter was received by Grant in the execution of the fraudulent scheme. Considering the errand on which Kaiser had been sent, it was fairly open to inference that Grant and his associates would naturally contemplate that the mails were likely to be used by Kaiser in communicating with defendants. Shea v. United States, 251 Fed. at page 448, 163 C. C. A. 458; Goldman v. United States (C. C. A. 6) 220 Fed. 57, 62, 135 C. C. A. 625. The carrying of the letter by Grant to his room, the not unreasonable probability that the postmark would suggest, even before the letter was read, that it was from Kaiser, coupled with the retention of the letter and the reply thereto, all tended to show that the letter was knowingly received as in the execution of such scheme. Goldman v. United States, supra. There is no controlling force in the claim asserted by Grant's testimony (even if taken as true) that precautions had been taken and instructions given to avoid the use of the mails in carrying out the fraud. Preeman v. United States (C. C. A. 7) 244 Fed. 1, 17, 156 C. C. A. 429. There is, however, evidence to the contrary in the testimony of Kaiser that defendants claimed at Mt. Clemens and at Newport that the winning ticket was sent from the former place and received at the latter by special delivery letter. It scarcely need be said that if Connell and Silva were associated with Grant in the execution of the fraud, the latter's act in the natural course of the scheme was their act also. Hitchman Coal & Coke Co. v. Mitchell, 245 U. S. 229, 249, 38 Sup. Ct. 65, 62 L. Ed. 260, L. R. A. 1918C, 497, Ann. Cas. 1918B, 461; Shea v. United States, supra, 251 Fed. at page 448, 163 C. C. A. 458.

The trial court properly submitted to the jury the question whether

Grant received the letter from the post office establishment with the instruction that if, when he received it from the proprietor's nephew, he knew that it had been received on his behalf and that it was from Kaiser, and he retained it and acted upon it, he thereby ratified the act of the niece in directly receiving it from the United States mails as fully as if he had in the first instance authorized her to so receive it; and that if the evidence is found to justify a conclusion that defendant Grant did so act, and thereby receive the letter from the United States mails, he and his confederates in the scheme equally received it.

[6, 7] (b) As to participation generally in the fraudulent scheme: As to Grant and Connell there was abundant evidence showing their active participation in the fraudulent attempt to swindle Kaiser. This evidence need not be set out. As to Silva, the testimony is less direct and complete; but we think there was substantial evidence warranting the submission of the charge as to him and so sustaining the verdict and judgment. The so-called pool room in Newport, to which Kaiser was introduced on his arrival with Grant and Connell from Mt. Clemens, was on Washington street. There was substantial testimony that the furniture and equipment of this room had been used in large part in a room used for the same purpose on Sixth street in the same city in 1916, and that those who owned or controlled the Sixth street place exercised similar control at the Washington street place in 1918; that Silva was connected with the 1916 operations at the Sixth street place and assisted in there swindling a victim by fake horse race betting of the same general nature as that involved here; that after the Sixth street transactions in 1916 were closed Silva and Goulet were partners in a gambling house at the same location.

Grant, Connell, and Kaiser left Detroit for Cincinnati on July 28, 1918. At 6:48 that evening a telegram over the initials "J. B." was sent from Detroit to Silva at Newport, reading: "Children will arrive to-morrow morning 7:50 Union Station." No explanation of this telegram is given. However, Grant, Connell, and Kaiser arrived at the Union Station, Cincinnati, the next morning at about 7 o'clock. It was fairly open to inference that the term "children" related to the three persons last named. On July 30, at 7 a. m., there was received at the Newport post office a special delivery letter, postmarked Mt. Clemens, and addressed to Silva. On the evening of August 5th, after Kaiser had returned to Cincinnati from West Hoboken, and shortly after Grant had visited Kaiser in his room at a Cincinnati hotel, Silva was seen to meet and talk with Grant on Fourth street, Cincinnati, near the hotel. It was testified that Silva left Grant, went to a drug store, and called up a number by telephone, and rejoined Grant; the two continuing their conversation on the street and spending some minutes together in a saloon. It was fairly open to inference that, when Grant met Silva, the latter was waiting for the former to come from Kaiser's room. Kaiser testified that Silva looked like the man who sat at the ticker in the Newport pool room, although he could not definitely identify him. The alleged fraudulent scheme failed of consummation, but it is a commonplace that success is not necessary to guilt. Foster v. United States (C. C. A. 6) 178 Fed. 165, 173, 101 C. C. A. 485.

[8] 3. The jury was instructed that evidence of the fake horse race betting frauds carried on at the Sixth street pool room in 1916 could be considered in determining whether or not Silva and Goulet were connected with the Kaiser transaction in 1918, provided the jury was convinced that there was a common scheme or plan between Silva and Goulet and the persons shown to be connected with the Kaiser transaction to swindle people by fake horse race betting. The instruction was later amplified as stated in the margin of this opinion.[1] We think there was substantial evidence tending to sustain the theory of such common scheme. This being so, the instruction was not erroneous. The earlier acts would in such case not be merely similar acts, and so admissible only for the purpose of showing the intent of the later acts. Shea v. United States (C. C. A. 6) 236 Fed. 97, 102, 149 C. C. A. 307, Id., 251 Fed. 440, 442, 163 C. C. A. 458. And see Schoborg v. United States (C. C. A. 6) 264 Fed. 1, 7. The fact that there is no proof that the 1916 frauds involved the use of the mails is not important. Shea v. United States (C. C. A. 6) 236 Fed. 99, 102, 149 C. C. A. 307, and cases there cited.

[9] 4. *The Admission of Evidence.*—Complaint is made of the admission in evidence of the special delivery letter and various telegrams addressed to Silva. In our opinion the court committed no error in this respect. It is not conclusively established that Grant, Connell, and Kaiser had all left Mt. Clemens when the telegram of July 28th was sent Silva. Nor does it appear when the special delivery letter given Silva July 30th was actually sent from Mt. Clemens. Granting that Kaiser had not reached Mt. Clemens when one or more of the telegrams were sent Silva, they are not thereby rendered incompetent. It was not necessary to the guilt of defendants that Kaiser should have been selected as victim at the outset, or at any particular time. Shea v. United States (C. C. A. 6) 251 Fed. at page 439, 163 C. C. A. 451. Moreover, Grant and Connell conceivably had at Mt.

---

[1] "If the evidence justifies a conclusion at your hands that the four defendants, Grant, Connell, Silva, and Goulet, were parties to the fraudulent scheme or swindling operations of 1916, and the swindling operations of 1916 were substantially the same in character as the attempt to swindle Frank Kaiser, and it is a reasonable and fair inference therefrom that there was a common scheme on the part of these four defendants, a common plan on their part, to swindle in that way any person that they could, and that that common plan and common scheme continued down until the time of the attempt to swindle Kaiser, you have a right to consider that circumstance, the existence of that common scheme and plan, in determining whether or not they were actually connected with the attempt to swindle Kaiser. That is the sole bearing of that evidence upon that point. It is essential that that common scheme or plan should have continued down until 1918, the time of the transaction charged here, in order that the evidence should be used to connect Silva or Goulet with the wrongful act charged in the indictment and on trial before you here. If Silva or Goulet withdrew, or abandoned or ceased to be a party to the common plan or scheme, then there is nothing before the Kaiser transaction, there is nothing in those operations of 1916, that is of any significance or bearing on this case, as tending to show that either one of them was connected with the Kaiser transaction."

Clemens at least one confederate in the man who posed as "manager" of the "club" at that place.

We find no error in the record, and the judgment of the District Court is affirmed.