### BUCKEYE COTTON OIL CO. v. SLOAN.

(Circuit Court of Appeals, Sixth Circuit. May 3, 1921.)

No. 3355.

1. **Libel and slander ☞114—Overstatement of amount of embezzlement does not warrant substantial damages.**

In an action for slander, where the defendant pleaded the truth of his charge that plaintiff embezzled the funds intrusted to him, the fact that the alleged slander charged the embezzlement of $90,000, while the evidence showed an embezzlement of only $26,000, does not justify an award of substantial damages.

2. **Libel and slander ☞101(5)—Burden is on defendant to prove plea of justification.**

In a slander case, the burden of proof is on the defendant to establish the truth of his plea of justification.

3. **Libel and slander ☞101(1)—Burden is on plaintiff to show that illegal speculations with funds of another were authorized.**

In an action for slander in charging that plaintiff had embezzled the funds intrusted to him by defendant, where plaintiff admitted that he had used such funds for speculations in cotton, which were contrary to law, but claimed authority from defendant for such use, the burden is on plaintiff to establish the authority claimed by him.

4. **Libel and slander ☞100(8)—Proof embezzlement was for benefit of company in which plaintiff was interested sustains plea it was for his own benefit.**

Proof that the speculations carried on by plaintiff with defendant's money were for the benefit of a company in which plaintiff was interested as a stockholder, and also under a profit-sharing contract of employment, sustains a plea of justification for a charge of embezzlement which alleged the embezzlement was for plaintiff's own benefit, though there may be a technical variance between the proof and the plea.

5. **Corporations ☞410—Authority of general manager to "hedge" on futures does not authorize pure speculations.**

Proof that the manager of a cotton seed oil company had authority to advance the funds of the company to ginning companies from which it

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

purchased the seed, to be used by them in buying seed cotton purchased, and that the ginning companies customarily immediately sold an equivalent amount of cotton for delivery at the time they expected to complete the ginning, which is legitimate "hedging," does not authorize an inference that the manager had authority to engage in pure speculations in cotton, by repeatedly and indiscriminately buying and selling futures in bucket shops, which does not come within any accepted definition of hedging.

[Ed. Note.—For other definitions, see Words and Phrases, Second Series, Hedging Contract.]

6. **Libel and slander** ⊛⟶112(1)—**Evidence held not to show knowledge by principal of agent's speculations.**

In an action for slander by charging plaintiff with embezzlement of defendant's funds intrusted to him as its agent, evidence as to the audit of the agent's accounts *held* not to show that the defendant had thereby acquired knowledge that plaintiff was speculating with the funds, so as to warrant an inference that plaintiff had authority so to do.

7. **Libel and slander** ⊛⟶7(12)—**Reasonable grounds essential to good faith belief in authority, to defeat plea of justification for charge of embezzlement.**

In an action for slander, where plaintiff relied on a good-faith belief that he was authorized to speculate with the defendant's money intrusted to him, to defeat the plea of justification for the charge of embezzlement against plaintiff, there must be good cause for the belief claimed by plaintiff to overcome the plea; it being insufficient that he had such belief as would authorize the jury to acquit him on a prosecution for the embezzlement.

8. **Evidence** ⊛⟶596(2)—**On justification plea in slander case need not show beyond reasonable doubt plaintiff's guilt.**

In an action for slander, where the defendant pleaded in justification the truth of the statement that plaintiff had embezzled funds intrusted to him, defendant need establish the truth of his plea only by a preponderance of the evidence; it not being necessary that plaintiff's guilt be proved beyond a reasonable doubt, as would be necessary to convict him of the crime.

9. **Libel and slander** ⊛⟶110(3)—**Evidence of other embezzlements admissible to rebut plaintiff's claim of belief in authority.**

In an action for slander, where defendant pleaded the truth of his charge that plaintiff had embezzled money intrusted to him, and plaintiff relied on a good faith belief he was authorized to speculate with that money to overcome the plea, evidence that plaintiff had embezzled other moneys intrusted to him was admissible on behalf of defendant, to rebut plaintiff's claim of good faith.

In Error to the District Court of the United States for the Western District of Tennessee; John E. McCall, Judge.

Action for slander by James Sloan against the Buckeye Cotton Oil Company. Judgment for the plaintiff, and defendant brings error. Reversed and remanded.

Caruthers Ewing, of Memphis, Tenn. (Ewing, King & King, of Memphis, Tenn., and W. B. Miller, of Chattanooga, Tenn., on the brief), for plaintiff in error.

Guston T. Fitzhugh, of Memphis, Tenn., for defendant in error.

Before KNAPPEN, DENISON, and DONAHUE, Circuit Judges.

DENISON, Circuit Judge. Sloan, as plaintiff below, had judgment for $30,000 in an action for slander against the Buckeye Company. A

former judgment in the same case for the plaintiff was reversed by this court in 250 Fed. 712, 163 C. C. A. 44. A full statement of the general facts is made in that opinion, and we do not repeat them here, but shall discuss the facts specifically, so far as necessary to the present decision. We shall name the parties as they stood below.

The alleged slander, which was the basis of the recovery, was uttered by Schoettlekotte, an agent for defendant. Whether there was evidence tending to show that the utterance was within the scope of his authority, or tending to show subsequent ratification, were questions which arose and were decided upon the former review. The same questions now arise again. Upon one, if not both, of these questions, the evidence upon this trial differs somewhat from that upon the former trial. The plaintiff insists that the differences are unsubstantial; defendant takes the contrary position. To say the least, it is doubtful whether the differences are such as would justify us in adopting a conclusion opposite to that which the court reached before as to the tendency of the evidence. We do not find it necessary to make a definite disposition of this subject.

Upon the former trial, the defendant stood upon its plea of general issue, which, under the Tennessee practice, amounted to admissions that, if the words were uttered by defendant, they bore the meaning alleged, and that the charge of embezzlement was false. Such evidence as came into the trial tending to show that the charge was true was received upon the theory that, if the defendant believed it to be true, the recoverable damages would be lessened. After the case was remanded, the defendant obtained leave to and did file a plea of justification. The form of this plea is not very artificial, but when we consider together the allegations and innuendos of the declaration and the justification of the plea, we think the latter should be interpreted as affirming that Sloan was short in his accounts with the Buckeye, in that, acting as trusted agent of the Buckeye, he had, without authority, used and lost the trust funds in bucket shop gambling for his own benefit, and that he was thereby guilty of embezzlement. The issue upon this plea the court submitted to the jury, which impliedly found it for the plaintiff. Defendant insists that the truth of the plea appeared by the undisputed facts, that this issue should not have been submitted, but that a verdict for defendant should have been directed for this reason.

[1] In approaching consideration of this contention, we do not overlook the fact that Schoettelkotte stated the shortage as being about $90,000, but identified it by the character of gambling loss, while the evidence upon this trial is directed to a corresponding shortage of $26,000. We do not regard this difference in amount as material, under the facts of this case. One who is guilty of embezzlement from his principal cannot be entitled to recover substantial damages in slander only because he was charged with taking a larger sum than he really took. The difference in the injury to his good reputation is not appreciable.

In determining the issue of justification, we are not embarrassed by our former decision. It is true that the same contention—that the

plaintiff was plainly guilty—was argued to us then, and that the opinion, somewhat casually, indicates that there was something for the jury on that subject; but the records then and now are very different, and the present record was made upon the trial of an issue which did not then exist. The differences between the records are too numerous for careful statement; one vital difference alone would be sufficient to show that the conclusion then reached need not now be adopted; and such an instance, we give in the margin.[1]

[2, 3] It is, of course, true in the abstract that the burden of proof is upon the defendant, in a slander case, to establish the truth of a plea of justification; but that generality is exhausted before it can apply to the facts here conceded. It is admitted by the plaintiff that he was the agent of the defendant, intrusted with defendant's funds to be used in the conduct of defendant's business, and that, of these funds, he used and lost $26,000 or more in one season, in gambling operations, in Memphis bucket shops and in deals conducted in his own name, and that he had no express authority to do so. Upon the situation as so far stated the embezzlement would stand conceded, and plaintiff's only answer is that what he did was within the implied scope of his authority. Defendant's general business, one territorial branch of which was being managed by plaintiff, was the manufacture and sale of cottonseed oil. It is not impossible that these bucket shop operations might have been within the scope of plaintiff's agency; but they were wholly repugnant to ordinary business principles, they were criminal by the laws of Tennessee, and certainly the situation of the pleadings here cannot free plaintiff from a heavy burden of producing, not vague and illusory, but substantial, testimony tending to support each element of the chain of inference which alone would justify the implication of authority.

We find, then, as to the tendency of the evidence upon this subject, only three questions to discuss: (1) Was the use of the funds "for his own benefit," within the meaning of the plea? (2) Was it

---

[1] On the first trial, plaintiff produced accounts sales, coming from, respectively, three bucket shops, among which defendant's money had been distributed; these showed, in each instance, losses of approximately the amount which had been paid to that (so-called) broker, and showed aggregate dealings purporting to be in cotton futures of about 10,000 bales. While the plaintiff did not, in express words, testify that the checks in question were appropriated to the losses shown by these accounts, the case was presented upon the theory that this was the proper inference, and that, since the amount of "spot" cotton handled during that season was about 10,000 bales, these particular dealings in futures aggregating this amount should be considered as within the authority given to "hedge" against the actual cotton handled. Upon the present trial, it appeared without dispute that these accounts sales were not those actually rendered at the time, but had been made up for the trial by selective draft upon the whole class of similar dealings with the bucket shops, aggregating 60,000 or 70,000 bales during the period of the accounts, and that the checks given to disburse defendant's funds were not specifically appropriated to these particular accounts sales. This showing of complete truth destroyed the tendency to support plaintiff's theory of authority, which it was sought to deduce from the inferences rested upon the partial truth presented on the first trial.

authorized? (3) Even if not, did he, in good faith, think it was authorized?

[4] 1. *His Personal Benefit.* Some restatement of the facts is necessary to develop this question. The Richmond Cottonseed Oil Company had been engaged in the manufacture and sale of cottonseed oil. It had oil mills for treating the seed, at Chattanooga and Memphis, Tenn., at Corinth, in northern Mississippi, at Kennett, in southeastern Missouri, and at Okolona, in Oklahoma. Each of these mills bought cotton seed from the cotton gins in the vicinity. Each was interested in having such a volume of cotton gin business as would produce the seed desired for making oil. In aid of this object, the Richmond Company had a group of cotton gins in the Kennett territory. Some years before the Richmond-Buckeye relations began, this group of gins had been formed into the Planters' Gin Company, under arrangements by which the entire purchase price was to be paid out of profits, and the Richmond retained the absolute control of the Planters', as far as it saw fit to exercise control. Little had ever been paid on this purchase price. Plaintiff had long been the manager of the Richmond, and owned a substantial stock interest therein. The greater part of the stock ownership was in Mr. Montague of Chattanooga, who evidently had continued to and did trust practically the entire management to Sloan, and who had come to have entire dependence upon Sloan's ability and integrity. On July 1, 1911, the Richmond Company had leased to the Buckeye Company the entire business of its Chattanooga, Corinth, and Kennett plants for a period of three years; but it was arranged that the business should continue to be carried on in the name of the Richmond Company, in order that its good will might remain at the end of the leased period. Sloan was employed as defendant's manager, for this purpose. Sloan, therefore, was to conduct, from a central office at Memphis, and on behalf of defendant, the business at Chattanooga, Corinth, and Kennett; but he was engaged, at the same time, on behalf of the Richmond Company, in conducting or closing up the Okolona business, which was not taken over by defendant, and the central plant of which was burned and was not rebuilt. For convenience, the real Richmond Company, and with reference to such business as it had which was not covered by the lease, is called Richmond No. 1, while the defendant's business, carried on in the name of Richmond, is called Richmond No. 2.

Before this lease, it had been customary for the Richmond to advance working capital to the Planters', wherewith the gin company bought cotton as offered, selling the seed to the Kennett plant, and selling the ginned cotton upon the market. These advances had accumulated until the Planters' was indebted to the Richmond in the sum of $12,000, in addition to the indebtedness of the stockholders of the Planters' to the Richmond Company for the full purchase price of the stock. It was at least doubtful whether the stockholders had any substantial interest; certainly there was a large measure of identical interest between the Richmond and the Planters'.

As manager of this business, plaintiff had authority to advance defendant's funds to the Planters' for the purpose of enabling it to buy

seed cotton; and the testimony tends to show that the checks against defendant's funds, which were paid to the bucket shops, purported to be treated by Sloan as advances to the Planters', within the scope of his authority (though he handled the whole matter himself, on behalf of the Planters', and no officer or other agent of the Planters' participated), and that the dealings in futures which he was carrying on with this money were intended by him to be at the ultimate expense of and for the direct benefit (if successful) of the Planters' Company, rather than to be put into his own individual pocket. To this extent, there is a variance between the language of the plea—"for his own benefit" —and the tendency of such testimony; but we do not consider that this variance, under the conceded facts and the pervading atmosphere of this case, is material.

It is no less embezzlement for an agent to convert his principal's funds, without authority, to the use of a corporation which the agent wishes to help than to his immediate personal use; and where, as here, if realized, the gains would have been for the primary benefit of a corporation (the Planters') in which defendant had no direct interest, but which was Sloan's tool, and for the ultimate benefit of another corporation (Richmond No. 1) in which defendant had no kind of interest, but in which Sloan had a direct, pecuniary share, and upon the success of which his personal reputation and career were dependent, and where, also, one-half the gains would have come directly to plaintiff, through his profit-sharing management contract, to the extent that such gains prevented the advances from being lost as bad debts—in such a situation, it is within the fair meaning of the language to say that, if what he did was embezzlement, it was "for his own benefit," and neither criminal prosecution nor justification in slander ought to fail merely because of such formal inaccuracy as there may be in that description of the act.

[5] 2. *His Authority.* Sloan's original authority to finance the Planters' Company out of the defendant's funds is evidenced by correspondence at about the time of his appointment, reciting or showing that he had explained that the Richmond Company was in the habit of making these advances to the Planters' in order that the Planters' might be in funds to buy cotton at the gin, and that it was understood he would continue this practice on behalf of defendant. In this correspondence, defendant expressly states that the holding of cotton during the very brief time incidental to ginning and marketing involves risk of loss by market changes, and that it wishes to reduce this speculative element to the lowest possible amount, and that it therefore desires that the cotton bought by the gins shall be sold at once in order to minimize this speculative risk. It may be assumed that two or three months might be occupied after the gin purchased and before it could deliver the cotton upon a suitable market. It was more or less customary for a gin, if it bought 100 bales of cotton in October, immediately to contract to sell the same amount on the January market, thus selling a "future," and avoiding risk of loss through an intervening possible drop in the market price. This was called "hedging," and was recognized as legitimately incidental to the business. It is therefore

to be assumed that the plaintiff's authority to finance the Planters' included this kind of hedging.

What happened during the (approximately) last year of the leasing period was that the cotton actually bought and ginned by the Planters' was not promptly sold, but was kept in storage for a long time, and was eventually sold at a heavy loss. The exercise of plaintiff's discretion on this subject is not challenged. While holding this cotton, and during the period commencing July 1, 1913, and ending in May, 1914, he went through the form of buying, in two Memphis bucket shops, about 60,000 bales of cotton futures and selling about the same amount.[2] He bought first, or sold first, indiscriminately, being sometimes "long" and sometimes "short"; but upon the whole series of deals, when finally closed, his net loss was about $42,000. Of this he had paid $26,000 with the defendant's checks, about $12,000 from sources which are left in more or less doubt, and about $4,000 was left unpaid, which he evidenced by his personal note, but later, in this litigation, claimed was really the debt of defendant to the "brokers"; and so it is, if his theory of authority is sustainable. To make his case, plaintiff's evidence must tend to show that this kind of dealing was rightly defined as hedging, or else that the defendant was chargeable with knowledge of what he was doing, and by its silence gave approval.

There is no evidence that this sort of dealing was within any accepted definition of hedging. When Sloan undertakes such inclusion, he always says that it was hedging, "as we understood the term," or "according to our custom," or with some similar qualifying phrase. There is no evidence from any other witness that this type of gambling was customary in the conduct of ginning operations, or was "hedging" properly referable thereto. No witness goes further than to say that this sort of thing was sometimes done by some gin operators. That, plainly, will not support an inference of a custom so general that the defendant must have had it in mind in making Sloan its agent for this business.

The theory upon which Sloan predicates an inference of authority deserves mention. He says that the storage and insurance charges against spot cotton make it expensive to hold, and therefore it is cheaper and better to sell the spots and buy futures. If it were the owner's policy not to sell his cotton, but to hold it against an expected rise in price (as it was not in this case), this theory is thus far plausible (though it was not applied by selling the spots); but Sloan carries it, as he must, much further. Having justified the purchase in December of 100 bales of March cotton, because he has sold 100 bales of spots instead of carrying them, he then uses the purchase of March futures to justify indiscriminate buying and selling thereafter during the remainder of the year, in January, March, May, July, or December futures, until he has been in and out of the market perhaps six times, and

---

[2] In addition to large amounts of oil—justified because it came from cotton seed—and of lard—justified because it was comparable with oil. The figures in the brief of defendant's counsel cover the items from the books of one "broker" only.

each time made gains or losses according to his gift of prophecy, and never either buying or selling a bale with intent of actual delivery, but in fact only betting against the bucket shop. He then undertakes to say that all these deals are legitimately incidental to the one-time ownership of 100 bales of spots.[8]

This needs only to be stated to show that these transactions are not "hedging" to guard against an anticipated possibility of loss from actual holdings, but constitute unadulterated gambling, in the hope of making a profit to retrieve a loss already suffered or feared. This theory, carried to the extent which it must be to be of any service to Sloan, is not even plausible; we may properly say of it, as we did of the theory upon which he recovered on the first trial, that "we find no testimony as to any facts from which in our opinion it could be fairly and legitimately inferred." 250 Fed. 721, 163 C. C. A. 44.

[6] When we come to the question of knowledge, express or implied, and approval by defendant, and consider whether these are shown by "substantial evidence," we must disregard some vague and general statements by Sloan. They must be taken in connection with the whole record. He repeatedly says that everything he did was with full authority and was fully understood; but he as constantly refers to documents or specific things as supporting him, and upon the whole record it is clear that these statements are his conclusions, and nothing else, and they may therefore rightfully be disregarded. For example, he stated that the defendant knew of these checks going to the bucket shops through the frequent audits of the Richmond No. 2 books, made by Routh, the defendant's auditor; but the fact is, without any dispute, that nothing appeared on the Richmond No. 2 books, or among its papers, except that these checks were charged to the Planters' Gin Company, and were certified by Sloan on the regular vouchers as being disbursements upon "gin and agency" account. Unless the nonresident auditor had known that the payees in some of the checks were bucket shop proprietors in Memphis, there would be nothing to raise even a suspicion that the payments were not made to or on account of the Planters' in the regular course of its ordinary business. Otherwise, no audit of the Richmond which was ever made would have disclosed a clue to the truth.

When we discard these vague generalities, and come to the specific items of evidence upon which Sloan relies, we find nothing which we can regard as substantial evidence, supporting the extraordinary inference alleged. It is impossible to take the space to review all these items and circumstances. Counsel for plaintiff has, in his brief, recited and grouped what he regards as plaintiff's strongest claims upon this subject. We have carefully reviewed each item of this

[8] The cotton-buying season at the gins begins about October. In the 1913–14 season, the Planters' bought about 10,000 bales and 2,000 or 3,000 bales are as much as it probably had on hand in November. In that month, as shown by the records of only two of the bucket shops, Sloan "sold" 13,700 bales and bought 7,000, at a commission cost of over $1,500.

group, and compared it with the record, and not one survives the test. We include, in a note at the end of the opinion,[4] a brief discussion of four or five of these claims, which on their face are those most plausible, and which illustrate how, seriatim, they are found to have no substantial existence.

It must be concluded as a necessary inference from the undisputed facts that Sloan's expenditure of this $26,000 to conduct these gambling operations was wholly without the authority of the owner of the money, express or implied, and constituted the embezzlement imputed by the pleadings, unless that conclusion can be escaped on account of some good faith supposition by Sloan that he had the right to use the money in this way, and even if his supposition was erroneous.

[7] 3. *His Good-Faith Belief.* It is conceivable that a belief by an agent in his authority to do something of this kind with his principal's money, even although the belief had no basis whatever, might protect him against a criminal prosecution, where the actual felonious intent was the essence of the crime, though this is difficult to comprehend, since a jury would be instructed that he could not be deemed to have such belief in good faith without something substantial on which to base it. Where one takes the property of another without right, the law ordinarily imputes intent. However that might be, there can be no such invariable protection, upon a plea of justification in slander, where the charge was that plaintiff, while acting as defendant's agent, converted its money to his own use without authority and was thereby guilty of embezzlement. If, upon such a slander trial, it is proved to be true that the conversion took place, and that the plaintiff neither had authority nor any reason whatever to believe that he had authority, he should not be permitted to recover substantial damages because, perchance, he carried in his mind some inexcusable and mistaken belief which might enable him to escape conviction upon indictment.

[8] The differing rules of evidence in criminal and civil cases furnish the vital distinction. The existence of a reasonable doubt as to plaintiff's guilt would require his acquittal; but we find no holdings that defendant, upon a plea of justification in a slander suit for charging a crime, must show plaintiff's guilt beyond a reasonable doubt. Such a plaintiff, whom the clear preponderance of proof shows to be guilty, ought not to recover even nominal damages. It is sufficient to say, for the purpose of this case, that there was no fact or circumstance on which any such good-faith belief could have been founded. The supposed good-faith belief must be deemed analogous to that intent to make a profit and then return the money which usually characterizes such cases.

[9] 4. *Evidence of Intent.* If the intent or the good-faith belief had been rightly in issue, it was error to exclude evidence which defendant offered regarding other transactions. The offers made had some tendency to show other breaches of trust in the use of defendant's funds by plaintiff in this same agency; but they were not to be

---

[4] See note at end of case.

excluded, for that reason, upon the trial of an issue where the intent of plaintiff was controlling. If it was true that during the same period he was diverting other sums of defendant's money, even if only temporarily, to the benefit of the Richmond No. 1 or himself, and at the risk of defendant, these things were pertinent on the inquiry whether he was intending to keep within his authority in the matter of these Planters' transactions. Shea v. U. S. (C. C. A. 6) 236 Fed. 97, 102, 149 C. C. A. 307. Some of the offers of proof did not go far enough to demonstrate that it was pertinent; others did. The probability that these matters will be important upon a new trial is not great enough to justify detailed discussion.

Because, upon the record as it took shape on this trial, the plea of justification should have been sustained by direction of the court, the judgment is reversed, and the case remanded for new trial.

### NOTE.

(a) There were many references to the "James Sloan Special" account on the books, and this was repeatedly named by Sloan as the basis of his inference that defendant had or was chargeable with knowledge of his course of dealing with the bucket shops. On the first trial, these references were vague and indefinite; upon the second trial, Sloan produced a complete transcript of what he says was the account in question. It turns out to be an. account kept on the books of Richmond No. 1, from January, 1906, to July, 1911, and was then an active account with many entries. During the later three-year lease period, it was relatively inactive, having only eight debit entries in the first two years, and none during the third. It seems apparent that all these later entries pertain solely to the business of Richmond No. 1, and were no part of the records of Richmond No. 2, since the old balances are retained, and carried forward and transferred, and the entries treated in a way that would seem to be impossible, if they had to do with the Richmond No. 2 business; but, if there is any error in this inference, it is at least plain that the account for these three years contains no reference to any of the checks in question, or to any Planters' transactions whatever. The account affords no substantial indication that any of the Buckeye's funds were being used for this unlawful purpose. The account is also relied upon to show that, before the lease, it had been the custom to use Richmond No. 1 funds for this purpose, and that thus an understanding that Richmond No. 2 should continue to finance the Planters' as Richmond No. 1 had done would cover the practices in question. Not only is there no evidence that the Buckeye ever had any knowledge of this old account before or during the lease period, but the account itself discloses only one reference to the Planters' (possibly, also, one small item in 1906), which shows that the Richmond No. 1 on February 28, 1910, wrote off a loss of about $5,000 marked, "P. G. Co., Cotton Loss." This may or may not have reference to some transaction of this kind; but, if the Buckeye had seen it, it would not establish notice of a custom to go beyond legitimate hedging. Some of the testimony references to the "James Sloan Special" account may be intended to refer to such an account on the books of the Planters', which would have indicated the use being made of these checks; but, if so, there is no evidence that the Buckeye ever saw these Planters' books, until during the later litigation. This account, thus put in evidence, does indicate that Sloan, on behalf of Richmond No. 1 had been continuously speculating in cotton, and had lost very large sums, but not that he was doing so habitually as a part of the management of the Planters' or any other subordinate company. Not only is there no evidence that the Buckeye knew of this account and of these entries, but it is plain enough that Sloan never would have permitted them to be so known, and the testimony indicates that they were not known even to Mr. Montague, the chief owner of the Richmond No. 1.

(272 F.)

(b) It might be inferred from parts of Sloan's testimony that McDonald, president of the Buckeye, understood about these transactions as they were going on and did not disapprove; but McDonald ceased to be president of or connected with the Buckeye long before the first of these checks. Such evidence as would tend to charge him with knowledge of a single transaction at Corinth, which might or might not have been of this character, is too vague and remote from the issue to have substance.

(c) Sloan seeks to have it inferred from his testimony that, when he made his disclosure at the end of the lease period to McCaw, who was then president of the Buckeye, McCaw agreed with or acquiesced in Sloan's claim of full authority. Sloan's own testimony as to this disclosure (if it is to be taken as true, as, for this purpose, it must be) makes it clear that he did not tell McCaw enough of the facts, as they now appear, to give him notice of what the actual situation was. Any acquiescence by McCaw, under these circumstances, has no evidential force to show formerly existing authority. At that time, McCaw advised him, Sloan says, that Sloan ought not to stand the losses under the situation as Sloan stated it, but ought to have them paid by Richmond No. 1, for which Sloan was really acting. The Buckeye has since undertaken to collect these sums from Richmond No. 1, and, whether or not it may succeed, Sloan's relations with each company were such that there is nothing necessarily inconsistent in the Buckeye claims that Sloan embezzled from it, and that the Richmond No. 1 was responsible to it therefor.

(d) Sloan says that the Buckeye Company knew about his custom of cotton speculations, because it was disclosed by an audit of the Richmond books, made by Schoettlekotte, the Buckeye agent. The fact is, appearing from the audit itself and otherwise, that Schoettlekotte did not become the Buckeye agent until after June, 1911, and that the audit in question was made by him five years before, while he was agent of the Richmond, and even then, the audit only shows that he found some entries that he did not understand and referred the company to Sloan for information.

(e) It is said that the Buckeye Company, in its dealings in oil, carried a "ring account," and that its transactions under that account were of the same character as Sloan's dealings here involved. It is therefore inferred that the Buckeye management might have approved Sloan's imitation of its conduct. On the former trial, the references to the ring account were confused and unexplained; on this trial, its character appears without dispute. The Buckeye owned numerous oil mills, and began, about October, to buy cotton seed and to press oil. It was in the habit of selling, at that time, on the Oil Exchange in New York ("the ring"), for delivery from time to time during later months, about one-third of its anticipated output. These were sales for actual future delivery, as against an actual product in the course of manufacture. They bear no resemblance to Sloan's speculations.